718 P.2d 1363 (1986)
301 Or. 57
In re Complaint as to the CONDUCT OF Clarence A. POTTS, M. Lyle Trammell and Terry G. Hannon.
OSB 81-52; SC S31433.
Supreme Court of Oregon, In Banc[*].
Argued and Submitted on October 2, 1985.
Decided April 29, 1986.
Mark McCulloch, of Powers, McCulloch & Bennett, Portland, argued the cause and filed the brief for accused Clarence A. Potts.
Jack L. Kennedy, of Kennedy, King & Zimmer, Portland, argued the cause for accused M. Lyle Trammell. With him on the brief and reply brief was Susan E. Watts, Portland.
Joe D. Bailey, of Landis, Bailey & Mercer, Portland, argued the cause and filed the brief and reply brief for accused Terry G. Hannon.
John S. Marandas, of Bloom, Marandas & Sly, Portland, argued the cause for Oregon State Bar. Mark M. Williams, Portland, filed the brief for Oregon State Bar.
PER CURIAM.
This attorney discipline case involves three attorneys. It arises out of their representation of the estate of Florin J. Becker, *1364 deceased. The Oregon State Bar filed complaints against Clarence A. Potts (Potts), M. Lyle Trammell (Trammell), and Terry G. Hannon (Hannon), charging excessive fees (DR 2-106(A) and (B)) and fee splitting (DR 2-107(A)).
The Trial Board and the Disciplinary Review Board found that all three had violated DR 2-106(A), and that Potts and Trammell had violated DR 2-107(A). The Trial Board recommended that each receive a public reprimand. The Disciplinary Review Board agreed as to Potts and Hannon, but recommended a 30-day suspension for Trammell. We find that each accused violated the DR 2-106 proscription against charging "an illegal or clearly excessive fee." We also find that Potts and Trammell violated DR 2-107(A). We find that Hannon did not violate DR 2-107(A).

FACTS[1]
Florin Becker and Ione Becker were long-time residents of the Gresham area. They owned, individually or jointly, a number of parcels of real property. Potts was a neighbor whose acquaintance with the Beckers goes back to the early 1950s. The acquaintance ripened into a lawyer-client relationship. Potts' relationship to the Beckers was not limited to that of lawyer to client; he also was a family friend and neighbor.
By the mid-to-late 1960s Potts was doing all the Beckers' legal work. Potts drafted land sales contracts, handled real property transactions and successfully represented the Beckers in litigation arising from their real property transactions. In 1972, Potts did estate tax planning for the Beckers, including revision of their wills and division of their assets to reduce estate taxes and probate costs.
In 1973 Potts retired from the active practice of law and went on a year-long church mission to Indiana. Upon his return he maintained his professional license but not his office facilities. He would prepare an occasional deed or contract upon request.
Mr. Becker died in September, 1979. Mrs. Becker, named in the will as personal representative, asked Potts to handle the probate of her late husband's estate. Potts agreed to do so, but told Mrs. Becker that he would require the assistance of a "young man with a firm in Portland" to handle the court work, tax matters and stenographic services. Mrs. Becker agreed. Potts then assisted Mrs. Becker and her stepdaughter, Florence (Becker) Cranmer, in preparing an inventory of Florin Becker's estate.
In September of 1979 Potts contacted Trammell, a partner in the firm of Pattullo, Gleason, Scarborough, Trammell and Hannon (the firm). Potts and Trammell agreed that Potts would handle client contacts with Mrs. Becker; Trammell and his firm would handle the court and tax work and prepare the estate documents. Trammell told Potts that the firm would charge for their services by the hour. Potts did not inform Trammell of his method of charging the client. Potts and Trammell agreed not to set a fee until they determined what was involved in the estate. Neither Trammell nor Potts discussed the fee with Mrs. Becker.
Trammell drafted and Mrs. Becker signed a "petition for probate of will and appointment of personal representative." This document nominated Mrs. Becker as the personal representative and stated that the firm of Pattullo, Gleason, Scarborough, Trammell and Hannon and Clarence A. Potts had been employed to assist the personal representative in the probate of the estate. On September 24, 1979, Mrs. Becker was appointed personal representative.
Mr. Becker's estate consisted of parcels of real property, the vendor's interests in certain real property contracts, stocks, bonds, and other personal property inventoried at an initial value of $212,688. An amended inventory put the value at $197,092. *1365 With the firm handling the court work and tax matters, Potts acted as information gatherer and go-between between Mrs. Becker and the firm. In the course of the probate, Potts made about 25 trips to the Becker residence. Some of the trips were to obtain Mrs. Becker's signature on probate documents. The visits usually lasted 15 to 20 minutes, though some were longer. Sometimes Mrs. Becker would keep overnight the documents that Potts had delivered to study them before signing. Mrs. Becker was alert, experienced, meticulous and conscientious in performing her duty as personal representative. She scrutinized each document presented to her for signature.
Potts also assisted in obtaining values of some of the assets of the estate. Potts testified that valuation of some assets raised unique valuation problems not usually encountered in probating estates of this size. He testified that determining the value of the municipal bonds was time-consuming. He also testified that it was difficult to evaluate the estate's interest in some of the real property contracts.
Potts, Trammell and John Mangelsdorf (Mangelsdorf), the firm associate who did the bulk of the estate preparation and tax work for the Becker estate, testified that much time was taken up responding to queries initiated by Mrs. Cranmer, trustee of a testamentary trust under the will. The trust was the main beneficiary. Potts, Trammell and Mangelsdorf stated that Mrs. Cranmer, a resident of Arizona, would review the probate documents with a son who was a certified public accountant. Mrs. Cranmer would forward questions to Mrs. Becker who would inquire of Potts, who would ask Trammell. He, in turn, would consult with Mangelsdorf. Mangelsdorf's answer would follow the same route in reverse. Mangelsdorf's questions regarding the preparation of the inventory of estate assets and other estate documents were handled the same way. This process essentially continued throughout the entire probate on all matters, not merely those related to questions initiated by the "Arizona heirs." Mrs. Becker testified that she did not recall Mrs. Cranmer asking any large number of questions, even though she spoke with Cranmer weekly by phone.
Potts performed other tasks not generally identified with the provision of legal services. On at least four occasions, he took Mrs. Becker's automobile in for servicing or repair. Potts also answered Mrs. Becker's questions regarding her grandson's use of her car, and counseled Mrs. Becker regarding personal friction between Mrs. Becker and Mrs. Cranmer.
In August 1980, Trammell asked Mangelsdorf for a breakdown of the amount of time that the firm had invested in the Becker estate. He was surprised to discover that the firm had $13,000 to $14,000 of time charged against the estate. Trammell decided to arrange for a partial payment of attorney fees. After reviewing his firm's time sheets and a discussion with Potts, Trammell reduced the firm's fee to $10,000. This amount included a sum sufficient to cover the work required to close the estate. The $4,000 reduction in the firm's fee was made partly to offset a perceived "duplication of efforts" between Mangelsdorf and Trammell and between Potts and the firm. Potts, who kept no time records, simply picked an amount that he considered would compensate him for his time, effort and responsibility. Although not familiar with prevailing rates charged for similar services by attorneys practicing in the area, Potts set his fee at $9,000 after reading an article that stated attorney fees in the Portland area had increased threefold since 1972. He testified that he relied on the probate judge to determine whether his fee was fair.[2]
*1366 In August 1980, at Trammell's direction, a "petition for partial payment of attorney's fees" was prepared by Mangelsdorf and delivered to Mrs. Becker by Potts. The petition called for a partial payment of attorney fees in the amount of $15,200. Mrs. Becker kept the petition overnight and signed it the next day in the presence of both Potts and Trammell without questioning either one or voicing any objection.
The affidavit supporting the petition for partial payment of attorney fees presented to the probate judge stated:
"I, John C. Mangelsdorf, am an attorney licensed to practice law in the state of Oregon and hereby make this Affidavit in Support of the application of the Personal Representative to be allowed the sum of $15,200 for partial payment of reasonable attorneys' fees and $49 for payment of miscellaneous costs incurred.
"The firm of PATTULLO, GLEASON, SCARBOROUGH, TRAMMELL AND HANNON, Attorneys at Law, P.C., has performed all services requested during the administration of the estate since September 12, 1979, the date of decedent's death. The sum requested represents less than 80% of the total fee anticipated for legal services to be performed in the administration of this estate and I believe said fee is reasonable.
"The value of the estate as represented by the Amended Inventory on file herein was $197,092."
The petition for partial payment of attorney fees stated that all federal and state income and inheritance taxes had been paid, that the Fiduciary Income Tax Return "will be filed shortly," that all creditors had been paid, and that the remaining assets were sufficient to pay all remaining claims or expenses. The attorney fee request stated:
"1. The following partial payment can now be made from the assets of the estate without loss to creditors or injury to the estate or any interested persons:
"Reasonable Attorneys' Fees in the
amount of $15,200
"Miscellaneous attorneys costs of
administration in the amount of $ 49"
The affidavit was signed by Mangelsdorf on August 18, 1980. Mrs. Becker signed the petition with the impression that a judge would review the charges and services rendered for fairness. The judge who reviewed the petition saw only the signature of the personal representative and the bare bones affidavit quoted above. There was no way for the judge to tell from that record whether the fees claimed met the standards set forth in ORS 116.183. There is no reference to Mr. Potts in the petition or affidavit.
Though she said nothing, Mrs. Becker was surprised by the amount of legal fees shown on the petition. On two earlier occasions she asked Potts for an explanation of what the attorney fees would be. The first time was in the spring of 1980. Potts told her that the probate court would set the fees. A second inquiry some time later left her without any real information on how the fee would be determined or what the fee would be. Instead, she came away only with the "impression it would be cheaper [if the attorneys set the fees] than if the court set them." Her failure to object immediately was due primarily to the trust she had in her attorneys at that *1367 time. She agreed to pay whatever was "fair" for the services rendered.
In 1980, after signing the petition for partial payment of fees, Mrs. Becker left to spend Thanksgiving with the Cranmers in Arizona. While there she became more concerned with the amount of legal fees charged against the estate. When Mrs. Becker repeated her concerns to Potts, she received no satisfactory explanation. After learning of Mrs. Becker's concerns upon her return from Arizona, Potts believed that he and Mrs. Becker could not agree on the amount of attorney fees. He came to the conclusion that their differences had to be settled in court. He testified that "there was no way for Mrs. Becker to settle that thing with me. We already decided that. So why would I [meet] with Mrs. Becker and argue about it. It was going to be decided in the court. So let's have it decided in court." Potts advised Mrs. Becker to make any further communications regarding the amount of the fee through Mrs. Cranmer. Potts informed Trammell of this conversation with Mrs. Becker and of her concern with regard to the attorney fees. Trammell did not seriously consider or address Mrs. Becker's questions and doubts.
Other than some errors in dates and figures on the inventory which Mrs. Becker caught, there were no other major problems confronting her as personal representative that required her to contact Potts. Mrs. Becker seldom consulted Potts regarding her duties as personal representative, although she confirmed the 25 visits from Potts and about nine telephone conversations with Potts regarding estate business.
On December 15, 1980, Mrs. Becker signed the "Final Account and Petition for Decree of Final Distribution." The petition contained an item showing $3,800 in attorney fees as remaining expenses of administration of the estate.
Shortly thereafter, a notice for the filing of objections was filed and mailed to the heirs. Mrs. Cranmer made an appointment with Mangelsdorf to discuss the amount of the attorney fees. By the time she arrived in Oregon for the meeting with Mangelsdorf, Mrs. Cranmer was convinced she did not have the expertise to assess whether Mangelsdorf's possible explanations of the size of the fee were reasonable. Because of her lack of expertise and her awareness that the deadline for filing objections to the final account was nearly upon her, Mrs. Cranmer sought the assistance of Roscoe Nelson, a Portland attorney, to prepare and file a formal objection to the final account. Mrs. Becker joined Mrs. Cranmer in Nelson's office and supported Mrs. Cranmer's position although only Mrs. Cranmer signed the objection. Mrs. Cranmer testified that she cancelled the appointment with Mangelsdorf.
After Mrs. Cranmer's objection was filed, Mr. Hannon took over the case for the firm. Hannon was the firm's litigator. Without contacting Mrs. Becker, Hannon began to prepare for the objection hearing. In fact, neither Potts, Trammell nor Mangelsdorf contacted Mrs. Becker regarding the objection hearing. In preparation for the objection hearing, Roscoe Nelson deposed Potts, Trammell and Mangelsdorf.
By March 6, 1981, the day of the objection hearing, Mrs. Becker still had not been contacted by any of "her" attorneys regarding the matter. Although it is disputed, Roscoe Nelson's testimony that he informed the firm of Mrs. Becker's position becomes more credible in light of Potts' testimony above and the circumstances surrounding the objection hearing. Potts, Trammell, Hannon and Mangelsdorf attended the objection hearing to defend the fees they charged. Each claimed surprise to find Mrs. Becker there to testify for Mrs. Cranmer, the objecting party.
Upon discovering Mrs. Becker in the objector's camp at the final account objection hearing, Hannon suggested that the objection had turned into a "fee dispute". The parties agreed to submit the matter to fee arbitration. Roscoe Nelson tendered a fee arbitration proposal to Potts and the firm, stating that $19,000 was the amount of the disputed fee. Thereafter, on March 25, *1368 1981, Hannon sent Mrs. Becker a bill for $27,044.51. This sum included nearly all of the amount rejected as duplicative by Trammell, and nearly $5,000 for defending the fee claim. On March 26, 1981, the accused lawyers submitted an arbitration petition stating the amount in controversy as $27,044.51. The fee amount ultimately was resolved by the arbitration process. This proceeding followed.

THE APPLICABLE DISCIPLINARY RULES
This case involves DR 2-106(A) and (B) and DR 2-107(A). DR 2-106(A) provides:
"A lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee."
Before December 30, 1970, Oregon, like most states, did not sanction attorneys for the size of their fee unless they charged a "fee so exorbitant and wholly disproportionate to the services performed as to shock the conscience of those to whose attention it is called." In re Richards, 202 Or. 262, 264, 274 P.2d 797, 797 (1954). On December 30, 1970, this court adopted a Code of Professional Responsibility that included DR 2-106(A) and (B) in their present form. The unconscionability standard was replaced by the "clearly excessive" standard defined by DR 2-106(B):
"A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include [[3]] the following:
"(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
"(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
"(3) The fee customarily charged in the locality for similar legal services.
"(4) The amount involved and the results obtained.
"(5) The time limitations imposed by the client or by the circumstances.
"(6) The nature and length of the professional relationship with the client.
"(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
"(8) Whether the fee is fixed or contingent."
DR 2-107(A), adopted at the same time as DR 2-106, provides:
"A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm or law office, unless:
"(1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.
"(2) The division is made in proportion to the services performed and responsibility assumed by each.
"(3) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client."[4]
*1369 The predecessor of DR 2-107 was Canon 34 of the Canons of Professional Ethics. Canon 34 provided: "No division of fees for legal services is proper, except with another lawyer, based upon a division of service or responsibility." Under Canon 34, measuring the relative division of service and responsibility between associate attorneys would not be undertaken unless the resulting fee was flagrantly excessive. ABA Formal Opinion No. 204 (1940); see, e.g., Bohm v. Holzberg, 69 Misc.2d 469, 329 N.Y.S.2d 907 (Sup.Ct.1972) (per curiam). DR 2-107(A) is markedly different from Canon 34. DR 2-107(A)(1) requires the prior informed consent of the client to any fee split. DR 2-107(A)(2) requires that any fee split be proportionate to services rendered and responsibility assumed. Under this provision the performance of some service or assumption of some responsibility is not enough of itself to justify any fee split between associated attorneys or firms. There must be a reasonable correlation between the amount of services rendered and responsibility assumed and the share of the fee received. See Prandini v. National Tea Company, 557 F.2d 1015 (3rd Cir.1977), vacated in part and remanded on other grounds 585 F.2d 47 (3rd Cir.1978). The valuation of the services provided and responsibility assumed by each attorney must be measured by the criteria set forth in DR 2-106.
In attorney discipline cases, the Bar bears the burden of establishing each element of an ethics violation by clear and convincing evidence. This means the Bar must show that the existence of the facts upon which the charges are predicated is highly probable.
Each of the accused was charged with violations of DR 2-106(A), (B),[5] and 2-107(A).

THE ACCUSEDS

POTTS
Potts was found guilty on all counts by both the Trial Board and the Disciplinary Review Board. The Disciplinary Review Board characterized Potts' role as
"* * * basically that of a messenger and public relations man to deal with the personal representative. His testimony, which was undisputed, was that he perhaps took 25 trips to the personal representative's home and spent anywhere from 20 minutes to 40 minutes per trip. Potts kept no time record whatsoever, and had no reasonable explanation for how his fee was fixed. His fee was clearly excessive, and not in proportion to the services performed."
While it is clear that Potts did perform some services for the estate, we agree that $9,000 was a clearly excessive fee in the facts of this case. As stated above, Potts was unfamiliar with the attorney fees charged by Portland area attorneys for services similar to those which he provided the Becker estate. He relied on a single magazine article and his own intuition to establish his fee. He told his client and argued to this court that he relied upon the probate judge to determine whether his fee was fair, claiming that the probate judge's approval of the petition for partial payment of attorney fees is conclusive regarding the reasonableness of the $19,000.
We have stated that we are not inclined to look behind the probate court's action in passing upon charges made for services actually rendered. See In re Thomas, 294 Or. 505, 526, 659 P.2d 960, 971 (1983). However, where the matter presented to the court was not disputed or contested, where there is strong evidence that an excessive fee has been charged and it is shown that the probate court passed on the matter without being informed of the relevant facts, we will give little weight to the probate court's decision.
To determine whether Potts' $9,000 fee was clearly excessive, we examine it in light of DR 2-106(B). The first factor listed *1370 is the time and labor required. Potts kept no records and had no estimate of the time spent on the Becker estate. It is uncontroverted that he made about 25 trips to Mrs. Becker's residence during the probate period. These trips ranged in duration from 20 minutes to about an hour. Included in the 25 trips were three or four trips by Mr. Potts for the purpose of taking Mrs. Becker's automobile in for servicing or repair.[6] Potts also accompanied Mrs. Becker and Mrs. Cranmer on trips to the bank to determine account balances and inventory the safe deposit box. He also helped determine the value of some of the estate assets. Potts' main responsibility, however, was to act as liaison between Mrs. Becker and the firm.
In his capacity as liaison person, Potts was to deliver and explain to Mrs. Becker estate documents prepared by the firm. Included was the duty to communicate questions and replies between Mrs. Becker and Trammell and Mangelsdorf. Potts considered himself to be the estate's attorney and charged for responsibility he assumed.[7]
None of the experts called by the accuseds to testify could give an opinion on the reasonableness of Potts' fee. This was because of the absence of any record or estimate by Potts of the time he spent on the estate and the lack of any substantiation in the probate record itself.
The second factor is the novelty and difficulty of the questions involved. Putting aside for the moment the number of alleged inquiries about the probate from Mrs. Cranmer, there is little in the record to indicate that unusual or unique legal questions were involved in the Becker estate.
Potts testified that he had problems valuing certain municipal bonds and the estate's interest in certain land sale contracts. The inventory of the estate of Florin Jasper Becker showed stocks and bonds as follows:

$5,000 State of Oregon general
 obligation bonds, 5.25%, due 2/1/02
 @ 88 4,400
$5,000 Pacific Power & Light
 Company, 10% due 2006 @ 85 4,250
$3,000 City of Sandy (Oregon), water
 system, 3.7%, due 1/1986 @ 81.5 2,445
$3,000 City of Forest Grove,
 swimming imp. bonds, 4.1%, due
 3/1/86 @ 85 2,550
46 shares Oregon Trail Savings &
 Loan Assoc. Reserve Fund @ 53/8 247
 -------
Total Stock & Bonds $13,892

It took Potts three weeks to determine the value of the municipal bonds. He did not, however, testify that he spent three weeks in determining the value, only that it was three weeks before "someone finally find [sic] some way of getting the value." Mrs. Becker testified that she got the same valuation simply by calling what was then First National Bank in Portland. The estate's interest in a land sale contract in which Mrs. Becker also had a vendor's interest was determined by reference to the land sale contract and assignment prepared by Potts in 1972 and Mrs. Becker's records.
No unusual skill was required to perform the legal services properly in this case. If any skill was required in this case, it would be that of an efficient and effective communicator. The record is replete with instances that reflect the absence or nonexercise of this skill.
The next factor we consider is how Potts' fee compares to "[t]he fee customarily charged in the locality for similar legal services." DR 2-106(B)(3). Experts called *1371 by the Bar estimated that a reasonable fee for all of the legal services performed for the Becker estate would be between $6,000 and $10,000. Roscoe Nelson testified that a reasonable fee for Potts' services would be $1,500.
We are convinced, beyond doubt, that the $9,000 fee charged for Potts' services was "clearly excessive" within the meaning of DR 2-106(A) and (B). The time and labor involved was not great enough to support the fee, and the fee is far greater than the fee customarily charged in the locality.
The Bar's complaint also accuses Potts of violating DR 2-107(A). The complaint charged that Potts
"* * * agreed to divide with the firm the fee charged to the personal representative in a manner disproportionate to the services performed and responsibility assumed by the Accused and the firm, respectively, in one or more of the following particulars:
"1. The Accused and the firm reached an agreement whereby it was decided the Becker estate would be charged $19,000, with the firm to receive $10,000 and the Accused to receive $9,000. This division was not based upon a proportion of services rendered or to be rendered by the firm and the Accused;
"2. The Accused sought $9,000 of the fee charged to the Becker estate without rendering services to justify such a fee."
Potts argued that the division of fees reflected not only the value of services rendered but also the value of responsibility assumed by the respective attorneys. For assumption of responsibility to justify a fee split disproportionate to the services actually rendered by the attorneys sharing the fee, the "assuming" attorney must accept and discharge responsibility commensurate with the fee charged.
In the present case Potts assumed little responsibility. We find that the division of the fee was not "in proportion to the services performed and responsibility assumed," DR 2-107(A)(2), and that the total fee, $19,000, "exceeded reasonable compensation for all legal services," DR 2-107(A)(3). We agree with the Trial Board and the Disciplinary Review Board that Potts violated DR 2-107(A).

TRAMMELL
Trammell was the firm's shareholder initially responsible for the firm's work on the probate of the Becker estate. He was Potts' contact with the firm and supervised Mangelsdorf's work. Trammell accompanied Potts to Mrs. Becker's residence on a number of occasions but did not take it upon himself to clarify the firm's relationship to the estate. It was Trammell who, in August of 1980, caused the firm's fee to be reduced from $14,000 to $10,000. Given the size of the estate, the nature and complexity of the assets involved and other factors, including dealing with inquiries and criticisms from the personal representative and heirs, we cannot say that $10,000 is a clearly excessive fee.
That is not the end of it, however, as the firm also billed $9,000 for Potts' services. The firm actually billed for the entire $19,000 amount. For the reasons stated above, $19,000 is clearly excessive under DR 2-106(A). We find that, on the facts known to Trammell, "a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee."
On the DR 2-107(A) charge, we find that the $19,000 division was not made in proportion to the services performed and responsibility assumed by each. DR 2-107(A)(2). Additionally, the fee charged was in violation of DR 2-107(A)(3) as it clearly exceeded the reasonable compensation for all legal services they rendered the client. Trammell is guilty of violations of DR 2-106(A) and 2-107(A).

HANNON
Hannon became actively involved in the Becker matter when Mrs. Cranmer filed her objections to the final account. At that time Hannon, the firm's litigator, took over from Trammell and began to gear up for *1372 the hearing. He was found guilty of violating DR 2-106(A) and not guilty of violating 2-107(A) by both the Trial Board and the Disciplinary Review Board.
The Disciplinary Review Board opinion states:
"The Trial Board found Hannon guilty of charging a clearly excessive fee by [virtue] of the fact that he prepared a bill for $27,044.51 to submit to the arbitrators, although he had no connection with the original fee determination of $19,000.00. This is a closer question since Hannon's testimony and the testimony of others, indicated that when the petition for partial payment of attorneys fees was prepared, the law firm had $14,000.00 worth of time at that point and decided to shave that time to $10,000.00 because of the `duplication of effort with Potts.' Mr. Hannon testified that he was merely adding that time back in for the arbitrators to consider. The question arises whether, once having submitted a bill for $19,000.00, could the law firm then revise the bill upwards to over $27,000.00 and not have that revision considered clearly excessive. Bar counsel in his closing argument made the following statement concerning these `tactics':" `So, to say that this is a good advocate's tactic is inappropriate. It's not a part of this entire proceeding. If they have an additional charge they should have charged Mrs. Becker an additional separate charge, but not part of the arbitration. So, obviously, they were using the system to try to obtain greater fees.'
"Although this is a very close question, the overall attitude exhibited by Mr. Hannon once he was involved in this proceeding would show by clear and convincing evidence the fact that the $27,000.00 fee being sought by him, renders him guilty of DR 2-106(A).
"The Trial Board properly acquitted Hannon of any fee splitting violation, since he took no part in the discussion as to the division. In a disciplinary proceeding, the Bar cannot apply the `unit rule' to find Hannon guilty because Trammell is."
We agree with the Disciplinary Review Board that Hannon was guilty of a violation of DR 2-106(A). We do not find it to be so close a question, however. The $27,000 charge was made by Hannon. Beyond question, it was excessive.
Hannon argues:
"When Mr. Hannon compiled and sent the total bill to Mrs. Becker he was not charging a fee to a client in the sense intended by the language of DR 2-106(A). * * * There was no prospect that Mrs. Becker might pay the bill. Compiling and sending the bill were acts analogous to preparing pleadings in litigation. * * * At that point Mr. Hannon's client was the firm."
Hannon sent Mrs. Becker a bill for $27,000. That was an excessive fee. DR 2-106(A) states: "A lawyer shall not * * * charge [a] clearly excessive fee." We have held that charging $19,000 violated DR 2-106(A). An increase to $27,000 was not justified. Zeal in representing his client, the firm, does not excuse him. Compare In Re Hiller, 298 Or. 526, 694 P.2d 540 (1985).
Hannon was found not guilty of violating DR 2-107(A) by the Trial Board and the Disciplinary Review Board because he had not been a party to the agreement between Trammell and Potts for the initial splitting of the $19,000 fee. We agree.

CONCLUSION
DR 2-106(A) places an affirmative duty upon attorneys to ensure that their fee agreements and charges are not "clearly excessive" or illegal. Making certain that an early clear understanding regarding fees is reached with the client aids the attorney-client relationship and lets the client know what to expect.[8]
*1373 That attorneys generally charge fees for their services is inescapable and in fact necessary "to enable the lawyer to serve his client effectively and to preserve the integrity and independence of the profession." EC 2-17. Granted, the very fact that attorney fees in a particular case are or may be charged to the client creates a "tension" between the interest of the attorney and the interest of the client. Even so, scrupulous attention must be paid to the interests of the client. Clearly that was not the case here.
Although this is the first case that we have decided that involves DR 2-106(A), compliance with it is required no less than with any other disciplinary rule.

SANCTIONS
A reprimand is the appropriate sanction for Potts, Trammell and Hannon. This opinion will serve as that sanction. The Oregon State Bar is awarded all of its actual and necessary costs and disbursements incurred. ORS 9.536(4).
NOTES
[*] Roberts, J., retired February 7, 1986.
[1] Unless otherwise stated, all facts are our findings of fact in our de novo review. ORS 9.536(3).
[2] ORS 116.183 provides:

"(1) A personal representative shall be allowed in the settlement of the final account all necessary expenses incurred in the care, management and settlement of the estate, including reasonable fees of appraisers, attorneys and other qualified persons employed by the personal representative. An award of reasonable attorney fees under this section shall be made after consideration of the customary fees in the community for similar services, the time spent by counsel, counsel's experience in such matters, the skill displayed by counsel, the excellence of the result obtained, any agreement as to fees which may exist between the personal representative and the counsel of the personal representative, the amount of responsibility assumed by counsel considering the total value of the estate, and such other factors as may be relevant. No single factor shall be controlling. [Compare DR 2-106(B).]
"(2) A personal representative who defends or prosecutes any proceeding in good faith and with just cause, whether successful or not, is entitled to receive from the estate necessary expenses and disbursements, including reasonable attorney fees, in the proceeding."
The probate judge was not provided information that would allow him to make a knowledgeable analysis of the criteria set forth in ORS 116.183(1).
[3] As we have observed, "Defining a term by what it `includes' may create ambiguity. The use of `includes' may imply that the definition is not limited to the matters `included.' See State Farm Fire & Cas. v. Reuter, 299 Or. 155, 161-62 n. 7, 700 P.2d 236, 240 n. 7 (1985)." Heritage Enterprises v. City of Corvallis, 300 Or. 168, 170 n. 3, 708 P.2d 601, 602 n. 3 (1985).
[4] DR 2-107 has been amended. The requirement that the fee division be made in proportion to the services performed and responsibilities assumed has been eliminated. Effective, June 1, 1986, DR 2-107 will provide:

"(A) A lawyer shall not divide a fee for legal services with another lawyer who is not a member of the lawyer's law firm or law office, unless"
"(1) The client consents to employment of the other lawyer after full disclosure that a division of fees will be made.
"(2) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.
"(B) DR 2-107(A) does not prohibit payments to a former firm member pursuant to a separation or retirement agreement."
[5] We note that no independent violation of DR 2-106(B) is possible. That subdivision merely defines "a clearly excessive fee" as used in DR 2-106(A). Cf. In re Vaile, 300 Or. 91, 97 n. 4, 707 P.2d 52, 55 n. 4 (1985) (DR 5-105(C)).
[6] In The Florida Bar v. Shannon, 376 So.2d 858 (Fla.1979), the Florida Supreme Court suspended the attorney for an estate for three months and a day and thereafter until he proved himself rehabilitated for charging the estate for 855 hours of physical work he performed on the estate. The court held the attorney's charge of $7.50 per hour constituted a clearly excessive fee where the attorney paid $2.50 an hour for similar work by others. The court held that an attorney doing physical work on an estate that would normally be done by someone else should pay himself laborer's wages.
[7] DR 2-106(B) does not mention "responsibility assumed" as one of the factors to be considered in determining the reasonableness of an attorney's fee. Perhaps this is because attorneys cannot limit their liability to their clients and so are always "responsible" for legal matters entrusted to them, DR 6-102(A).
[8] This recommendation to would-be clients from a 1985 Oregon State Bar publication entitled Oregon Legal Resources Guide is in point:

"How much can I expect to pay for legal services?
"Don't be afraid to ask about fees. You should discuss the cost of the legal services during the first interview with your lawyer."
`* * * * *
"What should I do after we agree upon the legal fees?
"You should have the agreement put in writing. This will help avoid misunderstandings and problems later. You can also ask the lawyer to send you itemized bills or statements showing the services performed and costs and expenses paid out." Id. at 7-8. EC 2-19 provides:
"As soon as feasible after a lawyer has been employed, it is desirable that he reach a clear agreement with his client as to the basis of the fee charges to be made. Such a practice will not only prevent later misunderstanding but will also work for good relations between the lawyer and the client. It is usually beneficial to reduce to writing the understanding of the parties regarding the fee, particularly when it is contingent. A lawyer should be mindful that many persons who desire to employ him may have had little or no experience with fee charges of lawyers, and for this reason he should explain fully to such persons the reasons for the particular fee arrangement he proposes."
The ethical considerations are not mandatory in character as are the disciplinary rules. Rather, the ethical considerations "are aspirational in character and represent the objectives towards which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations." Preliminary Statement, ABA Model Code of Professional Responsibility (1980).