Argued and submitted November 6, 2000, accused suspended from the practice of law for four months February 23, 2001

## In re Complaint as to the Conduct of

## WILLIAM B. WYLLIE,
*Accused.*

## (OSB 97-84, 98-35; SC S47249)

19 P3d 338

See also 327 Or 175, 957 P2d 1222.

William B. Wyllie, Crescent Lake, argued the cause and filed the brief *in propria persona*.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

Before Gillette, Durham, Kulongoski, Leeson, and Riggs, Justices.*

PER CURIAM

---

* Van Hoomissen, J., retired December 31, 2000, and did not participate in the decision of this case. Carson, C. J., and De Muniz, J., did not participate in the consideration or decision of this case.

## PER CURIAM

In this lawyer discipline proceeding, the Oregon State Bar (Bar) filed four causes of complaint against the accused, alleging a total of eight violations of the Code of Professional Responsibility Disciplinary Rules (DRs), including DR 5-105(E) (current client conflict); DR 9-101(A) (failure to deposit client funds into trust account); DR 2-106(A) (charging or collecting illegal or excessive fee); DR 1-102(A)(3) (conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 2-110(A)(2) (improper withdrawal); DR 6-101(B) (neglect of legal matter); DR 7-101(A)(1) (intentionally failing to seek lawful objectives of client); and DR 7-101(A)(2) (intentionally failing to carry out contract of employment).[1] A trial panel of the Disciplinary Board concluded that the Bar had proved that the accused violated the first three rules listed above, but that the Bar had failed to prove the remaining charges by clear and convincing evidence. The trial panel suspended the accused from the practice of law for 18 months. Because the trial panel held that the accused should be suspended for more than six months, this court's review is automatic. ORS 9.536(2); BR 10.1; BR 10.4. On *de novo* review, ORS 9.536(3); BR 10.6, the Bar asks this court to find the accused guilty of all the charges and to disbar him. For the reasons that follow, we hold that the accused violated DR 5-105(E), DR 9-101(A), and DR 2-106(A), and we suspend him from the practice of law for four months.

### FACTS

Many of the facts in this case are contested, as we note below. On March 26, 1996, Billy Wayne Yother, Jr. (Yother junior), his sister Laura Yother, and his girlfriend Denise Szlavich (collectively, the defendants) were indicted for burglary and assault in connection with an altercation with Szlavich's former husband and his girlfriend over the physical custody of Szlavich's child. Both Szlavich's former husband and his girlfriend were injured. The defendants were arraigned on April 18, 1996, and their trial was scheduled for September 17, 1996. The defendants filed affidavits

---

[1] The Bar also filed a fifth cause of complaint, which the trial panel dismissed. The Bar does not seek review of the panel's dismissal of that cause of complaint.

of indigence. The court appointed Reid to represent Yother junior, Bispham to represent Laura Yother, and Hickam to represent Szlavich. Those lawyers remained counsel of record throughout the criminal proceedings, and each recommended that his client plead no contest to reduced charges.

The accused had represented Billy Wayne Yother, Sr. (Yother senior) in the past on other matters. After the defendants had been indicted, and in response to their lawyers' recommendations that they plead no contest to reduced charges, Yother senior contacted the accused. Yother senior and the defendants met with the accused on April 8, 1996, for approximately one hour. The defendants told the accused that their trial date was September 17, 1996. The Bar contends that, at that meeting, the defendants retained the accused to represent them on the charges at trial. The accused responds that Yother senior retained him to provide a second opinion about whether the defendants should plead no contest, and that he gave Yother senior his opinion orally.

The defendants had an appointment to meet with the accused on April 22, 1996, but they failed to appear. The next day, however, they met with the accused for approximately one hour. The Bar contends that, at that meeting, the accused informed the defendants that he would require a retainer fee of $500 each to represent them. The accused did not enter into a written retainer agreement with the defendants. According to the accused, no written retainer was required, because Yother senior had retained him to provide a second opinion about whether the defendants should plead no contest and the accused frequently did not have retainer agreements with established clients.

On May 1, 1996, the accused sent a bill to Yother senior for $1,850. It reflected a charge of $150 for the April 8 "conference with client x 3;" $50 for a "missed appointment" on April 22; $150 for the April 23 "conference with client x 3;" and a "[r]equested retainer fee" of $1,500 dated April 23. Apparently, the accused's hourly fee was $150.

On May 6, 1996, the accused received $600 in cash. Yother junior believes that his mother provided that money; Szlavich contends that she provided it from her income tax return. The accused deposited the money into his personal

account rather than into a client trust account. On June 29, 1996, the accused received another $150, which he also deposited into his personal account. Yother junior testified that he and Szlavich had paid the accused the $150. On August 1, 1996, the accused sent Yother senior a bill for $1,100. That bill acknowledged payment of $750, and it did not indicate that the accused had done any additional work on the case.

On September 11, 1996, the accused apparently met with one or all of the defendants for approximately 30 minutes. On October 1, 1996, the accused sent Yother senior a bill that acknowledged receipt of $750 and reflected a charge of $75 for "conference with client ½" on September 11. The October 1 bill reflected a balance due of $1,175, for a total of $1,925 for the accused's services.

Before that, on September 12, 1996, the trial court had held "readiness hearings" to confirm that the defendants and the state were prepared for trial on September 17, and the parties reported that they were ready. On September 16, Yother junior called the accused. The accused told Yother junior there was nothing he could do for the defendants at trial, because he would need more time to prepare if he were going to represent them at trial.

The next day, before the trial began, Bispham told the trial court that he just had learned that Laura Yother and Yother junior had hired the accused to represent the defendants at trial. Reid and Hickam then conferred with their clients and confirmed what Bispham had said. At the defense lawyers' request, the trial court then placed a telephone call to the accused. The court reported to the defendants and their lawyers that the accused had said that he had been retained only in an "advisory capacity" and that he was not representing the defendants at trial. The trial court also noted that the defendants had not terminated their lawyer-client relationships with their appointed counsel. After a brief recess, each of the defendants expressed a desire to enter a plea of no contest to the charge of assault in the third degree. After making inquiries about whether the pleas were knowing and voluntary, the trial court also confirmed that none of the defendants was relying "upon any legal support

from [the accused]" and that the accused "was not [the] attorney of record" for any of them. The trial court accepted the defendants' no contest pleas and placed them on probation.

On September 23, 1996, the deputy district attorney (DDA) who had prosecuted the cases against the defendants wrote to the Bar suggesting that the accused may have had an inappropriate fee arrangement with the defendants. On October 1, 1996, assistant disciplinary counsel, Cooper, wrote to the accused explaining the DDA's concerns and asking him to respond. In a letter dated October 2, 1996, the accused stated that he had been retained to provide a second opinion about whether the defendants should plead no contest to some of the charges and explained that his fee had been based on the amount of time he worked on the case. The accused also stated that, on September 11, 1996, he had asked the defendants to have their court-appointed counsel contact him, but none had done so. The accused further stated that Yother junior had called the accused the day before trial, and that the accused had told him that he could not prepare for trial and appear on one day's notice. The accused also repeated what he had told the trial court, namely, that he was not the attorney of record and that he had not agreed to represent the defendants at trial.

On April 25, 1997, the Bar referred the matter to the Clackamas/Linn/Marion Local Professional Responsibility Committee (LPRC), asking it to investigate. The LPRC subsequently recommended that the Bar dismiss charges relating to the fee matter that the DDA had raised but that it prosecute the accused on several other charges.

On August 25, 1997, Cooper wrote to the accused that the Bar would institute formal disciplinary proceedings against him related to the DDA's letter of September 23, 1996. She stated that the complaint would allege violations of DR 1-102(A)(3), DR 2-106(A), DR 2-110(A), DR 5-105(E), DR 6-101(B), DR 7-101(A)(1), DR 7-101(A)(2), and DR 9-101(A), but she did not identify what conduct the Bar relied on to support those allegations. Eight months later, on April 27, 1998, the Bar filed its complaint alleging violations of the rules that Cooper had listed in her letter of August 25, 1997.

Approximately a year later, on April 8, 1999, the Bar filed an amended complaint alleging violations of the same rules.

The accused answered on June 10, 1999, denying the charges and asserting, as an affirmative defense, that there had been unreasonable delay in prosecuting the matter and that the delay had caused "serious detriment" to his defense. The trial panel rejected the accused's affirmative defense. After a hearing on November 2, 1999, the trial panel found that the accused had an attorney-client relationship with the three defendants and that, in undertaking to represent all three, he had a current client conflict, because Szlavich, as the parent of the child involved in the custody dispute, "stood in a materially different position with respect to her potential defenses to the criminal charges against her" than the other two defendants. The trial panel also found that the accused had agreed to charge the defendants on an hourly basis for time expended, that his fee was excessive in relation to the work he performed, that he had been "sloppy" and "careless" in failing to place the $750 fee he received in his client trust account, but that he had not converted client funds intentionally.

The trial panel also found that the Bar had failed to present clear and convincing evidence that the accused had agreed to represent the defendants at trial. Accordingly, it concluded that the accused was not guilty of improperly withdrawing, neglecting a legal matter, or intentionally failing to seek the lawful objectives of his clients or to carry out his contract of employment. The trial panel also found that the Bar did not prove by clear and convincing evidence that the accused had engaged in dishonesty, fraud, deceit, or misrepresentation in connection with the fees he charged or collected from the defendants. The trial panel concluded that the accused should be suspended from the practice of law for a period of 18 months and that he should be required to make restitution of $375 in excess fees.

On review, the Bar asks this court to uphold the trial panel with respect to its findings of guilt, reject the panel's dismissal of the other charges, and increase the sanction imposed to disbarment. We begin with the third cause of complaint.

## THIRD CAUSE OF COMPLAINT:
## NEGLECT AND DESERTION

■ The Bar alleges that the accused violated DR 2-110(A)(2), DR 6-101(B), DR 7-101(A)(1), and DR 7-101(A)(2) by withdrawing from employment without taking reasonable steps to avoid foreseeable prejudice to his clients, neglecting a legal matter entrusted to him by failing to prepare for and appear at the defendants' trial, and failing to carry out a contract of employment. The Bar acknowledges that those charges turn on resolution of the primary factual dispute in this case, namely, whether the accused agreed to represent the defendants at trial.

The Bar relies on Yother junior's and Szlavich's testimony that they thought that the accused was going to represent them at trial and that the accused discussed trial strategy with them. It also relies on the fact that the defendants met with the accused only a week before trial and that Laura Yother and Szlavich expressed shock and disappointment the day of trial when they learned that the accused was not going to be there.

Only two of the defendants, Yother junior and Szlavich, talked to the LPRC investigator or testified at the hearing. As the trial panel noted, their testimony consisted primarily of short affirmations of Bar counsel's leading questions. Their testimony was short on detail about the conversations that the accused had with them, beyond their repeated assertions that they thought that the accused would represent them at trial even though each had appointed counsel. According to the LPRC investigator's report, Yother junior and Szlavich stated that the accused spent a lot of time in his meetings with them boasting about his successes in court in criminal proceedings and discussing the individual abilities and weaknesses of the lawyers in the Linn County District Attorney's office. They attributed his talk to the fact that the accused is "an old man." Their dismissive attitude toward the accused in their interview with the LPRC investigator stands in marked contrast to their testimony before the trial panel that they had believed before their criminal trial that the accused was taking care of everything for them and that he would make a surprise appearance on the day of

trial to assure that they were not convicted. We agree with the trial panel that Yother junior's and Szlavich's testimony was not persuasive.

In addition, the record reveals that, despite inconsistencies in his testimony on other matters, the accused never wavered in his assertion about the scope of his representation in the criminal matter. On September 17, 1996, he told the trial court that he had been retained only to provide a second opinion about whether the defendants should plead no contest to reduced charges; he wrote the same to Cooper on October 2, 1996; he told the same thing to the LPRC investigator in July 1997; and he testified to the same effect in his deposition on July 13, 1999, and before the trial panel on November 2, 1999.

Finally, the defendants had appointed counsel to represent them at trial, a fact of which the accused was aware. The accused testified that he attempted to contact Bispham to discuss the charges against the defendants, but Bispham did not return his telephone calls. The accused also stated in his deposition that, if he had been retained to represent the defendants at trial, there would have been a substitution of counsel.

Based on our review of the record, we agree with the trial panel that the Bar has failed to prove by clear and convincing evidence that the accused agreed to represent the defendants at trial. Accordingly, the predicate for the Bar's third cause of complaint is missing, and we conclude that that cause of complaint must be dismissed. We turn to the Bar's contention that the accused nonetheless violated DR 5-105(E).

## FIRST CAUSE OF COMPLAINT: CURRENT CLIENT CONFLICT OF INTEREST

■ The Bar contends that, even if the accused agreed only to provide a second opinion about whether the defendants should plead no contest, he had a lawyer-client relationship with them, their interests were in likely conflict, and the accused was required, but failed, to comply with the requirements of DR 5-105(E). That rule provides:

> "Current Client Conflicts - Prohibition. Except as provided in DR 5-105(F), a lawyer shall not represent multiple current clients in any matters when such representation would result in an actual or likely conflict."

An "actual conflict of interest" exists when the lawyer "has a duty to contend for something on behalf of one client that the lawyer has a duty to oppose on behalf of another client." DR 5-105(A)(1). A "likely conflict of interest" exists in all other situations "in which the objective personal, business or property interests of the clients are adverse." DR 5-105(A)(2). DR 5-105(F) permits representation of multiple current clients "when such representation would not result in an actual conflict and when each client consents to the multiple representation after full disclosure." Only likely conflicts may be waived after full disclosure; actual conflicts are not waivable. Full disclosure requires the lawyer to explain to the client the potential adverse impact of the multiple representation, advise the client to seek independent legal advice about whether consent should be given, and contemporaneously to confirm the disclosure in writing. DR 10-101(B).

The threshold question is whether the accused had a lawyer-client relationship with the defendants. The trial panel found that he did. A lawyer-client relationship may be inferred from the circumstances and the conduct of the parties. *In re Wittemyer*, 328 Or 448, 456, 980 P2d 148 (1999). A lawyer-client relationship may be found based on the putative client's objectively reasonable belief that a relationship has been established. *Id*. However, the putative client's subjective belief must be accompanied by evidence that the lawyer understood or should have understood that the relationship existed. *Id*.

In this case, the defendants had an objectively reasonable belief that the accused had been retained to provide them—not just Yother senior—with legal advice, and the accused understood that the relationship existed. The accused met with the defendants three times; Yother senior was present only at the first meeting. According to the accused, he conducted research on the defendants' behalf, and he gave them advice about whether they should plead no

contest.[2] Yother junior and Szlavich paid the accused at least $150 of the $750 he received for his legal advice. We conclude that the accused had a lawyer-client relationship with the defendants.

 We turn to whether the accused violated the rules against current client conflicts when he undertook to provide the defendants with advice about whether they should plead no contest. This court has explained that a lawyer who is asked to represent multiple clients who have potentially differing interests must weigh carefully the possibility of impaired judgment or divided loyalty and that employment should be refused if there is the slightest doubt about whether the employment will involve a conflict of interest. *See In re O'Neal*, 297 Or 258, 264, 683 P2d 1352 (1984) (so stating and citing authorities). A conflict exists when a lawyer is in a position where the exercise of the lawyer's independent professional judgment on behalf of one client would be adversely affected by the differing interests of the other clients. *In re Porter*, 283 Or 517, 524, 584 P2d 744 (1978). When a conflict exists, "the fact that representation may not include going to trial does not solve the problems inherent in such conflicts." *O'Neal*, 297 Or at 263.

In this case, the defendants had been charged in a single indictment with first-degree burglary and third-degree assault for unlawfully entering a dwelling and injuring Szlavich's former husband and his girlfriend. Their court-appointed lawyers had advised each of them to plead no contest to reduced charges. Yother senior and the defendants retained the accused to give them a second opinion about whether the court-appointed lawyers were giving the defendants good legal advice.

The accused testified that, in his view, each of the defendants had a different defense and he told both Yother senior and the defendants that their defense positions were "substantially different." Among other things, the accused reasoned that, as to Yother junior and Laura Yother, there was a serious question about their legal right to try to

---

[2] The accused testified that he also called Yother senior and gave him an oral opinion about whether the defendants should accept plea bargains.

retrieve Szlavich's child from the child's father. As to Szlavich, by contrast, the accused believed that she might have been entitled legally to exert force in the effort to retrieve her child. The accused also testified that he understood that the availability of different defenses for each of the defendants created a likely current client conflict of interest, and he advised them orally of the specific nature of the conflicts that could arise based on their assertion of those defenses. However, the accused did not advise the defendants of the conflict in writing, and he did not advise them to seek independent counsel to determine whether they should consent to his representing them for the purpose of giving a second opinion about whether they should plead no contest. The accused reasoned that he did not need to advise the defendants to seek independent counsel because "[t]hey already had counsel, so that wasn't necessary."

On this record, we conclude that the accused had a likely current client conflict of interest when he agreed to provide the defendants a second opinion about whether they should plead no contest to reduced charges. As the custodial parent of her child, Szlavich might have had defenses available to her that were not available to Yother junior or to Laura Yother. Moreover, one or all of the defendants could have argued that it was either or both of the others, not him or her, who injured the victims. *See In re Jeffery*, 321 Or 360, 370-71, 898 P2d 752 (1995) (likely conflict of interest where accused represented codefendants in criminal matter, clients had potential interest in convincing trier of fact that one defendant was less culpable than the other, and each client had potential interest in obtaining favorable plea agreement in exchange for testimony against other). Whether it was advisable for any or all the defendants to plead no contest to reduced charges depended on their respective defense strategies, and the possibility existed that the defendants' interests were adverse to one another regarding those strategies. The accused had a likely current client conflict of interest that he was required to disclose fully under DR 5-105(E).

■ The accused's contention that he was excused from fully disclosing the likely conflict of interest among the defendants because the defendants already were represented by appointed counsel is not well taken. The defendants' counsel

were appointed to represent them on the criminal charges, not to advise them whether they should consent to the accused's continued representation in light of the likely conflict. The accused was not excused from providing the full disclosure required by DR 10-101(B). We hold that the accused violated DR 5-105(E).

### FOURTH CAUSE OF COMPLAINT: CHARGING AND COLLECTING A CLEARLY EXCESSIVE FEE

The Bar contends that the accused violated DR 2-106(A) by billing Yother senior for $1,925 and for collecting $750 when he had worked only two-and-one-half hours on the case at a rate of $150 per hour. DR 2-106(A) provides that "[a] lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee." The accused's response is twofold. First, he contends that the October 1, 1996, bill reflecting a remainder due of $1,175, clearly was an error that he would have corrected if it had been brought to his attention. Second, the accused contends that, notwithstanding that the bills indicated that he had worked only two-and-one-half hours on the case, he had spent an additional three to four hours doing research that was not reflected in the bills and for which he was entitled to payment at the rate of $150 per hour. Because he was paid only $750 and never sought to collect any more after October 1, 1996, the accused contends that he did not collect an excessive fee.

As explained earlier, the accused did not enter into a written fee agreement with Yother senior or with the defendants. However, the accused told Cooper, in his letter of October 2, 1996, and the LPRC investigator that he was providing his services on an hourly basis. The accused also told the LPRC investigator that his secretary had made a mistake in billing Yother senior for his time rather than charging his time against the $1,500 retainer fee. Finally, the accused's secretary testified that the accused charged "by the hour" for criminal cases.

The only evidence in the record that contradicts the conclusion that the accused charged an hourly fee in this case is the accused's testimony that he had charged Yother senior

a nonrefundable retainer fee of $1,500 for his services. However, in his briefing to this court, the accused does not dispute that he charged an hourly fee; he argues only about how many hours he worked on the defendants' case. We conclude that the accused agreed to work for an hourly fee, and we turn to whether he was entitled to charge or to collect more than $425 for his services.

The accused told the LPRC investigator that the total amount of time that he had spent on the case was two-and-one-half hours, the same amount of time that was reflected in the three bills he sent to Yother senior. At the hearing, the accused testified that he spent three or four hours doing research on the case, but he produced no records at any time during these proceedings to document that fact. Indeed, the accused claims to have destroyed the Yother file in May 1998, even though the original complaint in this matter had been filed a month earlier. Based on the record before us, we conclude that the accused worked two-and-one-half hours on the case. At his hourly fee of $150, plus $50 for a missed appointment, the accused was entitled to collect a fee of $425. Even viewed in the light most favorable to the accused, he charged a fee of $1,850, and he collected a fee of $750. The accused violated DR 2-106(A) by charging and collecting an excessive fee.

## SECOND CAUSE OF COMPLAINT:
## CONVERSION

■ Finally, the Bar contends that the accused violated DR 9-101(A) when he deposited the $750 that he received directly into his personal account before he had earned it. DR 9-101(A) provides, in part:

"All funds of clients paid to a lawyer * * * shall be deposited and maintained in one or more identifiable trust accounts * * *.

"* * * * *

"(2) Funds belonging in part to a client and in part presently or potentially to the lawyer * * * must be deposited therein but the portion belonging to the lawyer * * * may be withdrawn when due unless the right of the lawyer * * * to receive it is disputed by the client in which event the

disputed portion shall not be withdrawn until the dispute is finally resolved."

Moreover, the Bar contends that the accused knowingly "helped himself" to client funds to which he was not entitled. By doing so, the Bar contends, the accused also violated DR 1-102(A), which provides, in part:

"It is professional misconduct for a lawyer to:

"* * * * *

"(3) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]"

The accused responds that he had earned more than $750 by the time he received that sum, because he had done more than two hours of work on the case by June 29, 1996.

This court has explained that conduct akin to theft is not a prerequisite to a finding of conversion. *In re Martin*, 328 Or 177, 184-85, 970 P2d 638 (1998). An actor who mistakenly believes that his or her conduct is legal nonetheless can commit conversion. *Id.* at 184. However, to violate DR 1-102(A)(3), there must be evidence—or an inference that reasonably follows from the evidence—that a lawyer had the necessary intent to appropriate funds. *Id.* at 189.

We already have found that the accused performed his services on an hourly basis and that he spent only two-and-one-half hours on the case, notwithstanding his testimony that he also had performed three or four hours of research. The accused's billing reflects that he worked on the case for two hours in April 1996 and that he charged $50 for a missed appointment on April 22, 1996. The accused received payments of $600 on May 5, 1996, and $150 on June 29, 1996. When the accused received those payments, he had earned only $350—reflecting two hours of work at $150 per hour and a charge for the missed appointment—but he deposited both payments into his personal account. The accused violated DR 9-101(A).

We turn to the Bar's contention that the accused knowingly converted client funds in violation of DR 1-102(A)(3). According to the Bar, the accused intentionally

had adopted a system "whereby all funds received by his office would be treated as his own property unless he specifically told his secretary otherwise." The accused's secretary testified that she informed the accused every time money came into the office. It follows, the Bar asserts, that the accused knowingly "helped himself to (and has since refused to refund) client funds."

The Bar's argument reduces to the proposition that, because the accused apparently did not have appropriate procedures in place for handling client funds generally, he knowingly misappropriated client funds in this case. That argument proves too much. It is true that the accused's testimony to the LPRC investigator and at the hearing was inconsistent about how much time he expended on this case, that his bills to Yother senior never reflected more than two-and-one-half hours of work, and that the accused never produced records that would establish that he performed three or four hours of research before receiving the payments in May and June of 1996. However, it also is true that, when the LPRC investigator showed the accused the bills that the accused had sent to Yother senior, the accused immediately acknowledged that there were errors in them and said that he would have corrected them if Yother senior had brought them to his attention. Moreover, at the time that the accused met with the LPRC investigator, the only matter that he knew was being investigated was the fee matter that the DDA had raised. It is not surprising that, at that time, the accused did not attempt to locate the notes he believes he kept regarding his research on possible defenses the defendants might have. On this record, we agree with the trial panel that carelessness and sloppiness, rather than dishonesty, fraud, deceit, or misrepresentation, best depict the accused's conduct. The Bar did not prove by clear and convincing evidence that the accused violated DR 1-102(A)(3).

## SANCTION

This court follows a well-established methodology in determining the appropriate sanction for violations of the disciplinary rules. *See In re Gustafson*, 327 Or 636, 652-53, 968 P2d 367 (1998) (describing methodology). Consistent

with that methodology, we refer to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards).

### 1. *Duty Violated*

The accused violated his duty to preserve client property, ABA Standard 4.1, and to avoid conflicts of interest, ABA Standard 4.3. The accused violated duties he owes to the legal profession by charging and collecting an excessive fee. ABA Standard 7.0.

### 2. *Mental State*

Under the ABA Standards, an act is "knowing" if it is engaged in with the awareness of the nature or attendant circumstances of the conduct, but without the conscious objective or purpose to accomplish a particular result. ABA Standards at 17. An act is "negligent" if the lawyer fails to heed a substantial risk that circumstances exist or that a result will follow that is a deviation from the standard of care that a reasonable lawyer would exercise in the situation. *Id.* For the reasons that we have discussed earlier in this opinion, we conclude that the accused acted knowingly regarding the conflict of interest that existed among the defendants. He acted negligently in charging and collecting an excessive fee, and in converting client funds.

### 3. *Injury Sustained*

The accused's conduct caused actual injury to his clients, because he collected an excessive fee from them. *See* ABA Standards at 17 (defining injury). That injury was mitigated to some extent, because the accused never sought to collect the full amount that he billed to Yother senior. The accused's failure to disclose fully the conflict of interest created by the different defenses that might have been available to the three defendants caused potential injury. *See id.* (defining potential injury). The Bar has not demonstrated any actual injury to the defendants, however. There is no evidence that the defendants were not represented competently by their appointed counsel or that the outcome of their criminal cases would have been different if the accused had disclosed completely the conflict of interest.

### 4. *Aggravating and Mitigating Factors*

There are several aggravating factors. First, the accused has committed prior disciplinary offenses leading to his being suspended twice from the practice of law. ABA Standard 9.22(a). He was suspended for one year for refusing to participate in and comply with a remedial program to deal with his alcoholism. *In re Wyllie*, 326 Or 447, 952 P2d 550 (1998) (*Wyllie I*). He was suspended for an additional two years for misrepresenting his compliance with MCLE requirements and failing to cooperate with the Bar investigation. *In re Wyllie*, 327 Or 175, 957 P2d 1222 (1998) (*Wyllie II*). Offenses that have been adjudicated before imposition of the sanction in the current case are aggravating factors. *In re Jones*, 326 Or 195, 200, 951 P2d 149 (1997).

Prior offenses receive a varying amount of weight as aggravating factors depending on several factors, including the similarity of the prior offenses to the current offenses and the timing of the current offenses; specifically, whether the accused had been sanctioned for the prior offense before engaging in the current offenses. *See id.* (identifying nonexhaustive list of factors). The Bar does not contend that alcoholism contributed in any way to the accused's misconduct in this matter. *Wyllie I* thus is dissimilar to the offenses in this case. *Wyllie II* involved misconduct that occurred in 1995, but the complaint in that matter was not filed until February 1997. The accused had not been sanctioned for the violations at issue in *Wyllie II* when he engaged in the misconduct at issue in this proceeding. Although the accused's prior offenses were serious and resulted in lengthy suspensions, under this court's case law, we do not give them much weight in determining the appropriate sanction in this case. *See In re Huffman*, 331 Or 209, 227-28, 13 P3d 994 (2000) (so demonstrating). However, we may take those suspensions into account in determining the starting date, should a suspension be imposed in this case.

Other aggravating factors are that the accused engaged in a pattern of misconduct, ABA Standard 9.22(c), by continuing to represent the defendants without fully disclosing a likely current client conflict of interest and by repeatedly charging and collecting an excessive fee. The

accused committed multiple offenses, ABA Standard 9.22(d), by not fully disclosing a current client conflict of interest, by charging and collecting an excessive fee, and by converting client funds; he refused to acknowledge any wrongful conduct, ABA Standard 9.22(g); he has substantial experience in the practice of law (having been admitted to practice in 1960), ABA Standard 9.22(i); and he has refused to refund the amount that he overcharged for his services, ABA Standard 9.22(j).[3] There are no mitigating factors.[4]

In light of the duty violated, the accused's mental state, the injury and potential injury the accused's conduct caused, the multiple aggravating factors, and the lack of mitigating factors, the ABA Standards suggest that a suspension is appropriate. *See* ABA Standard 4.12 (suspension generally appropriate when lawyer knows or should know is dealing improperly with client property and causes injury or potential injury to client); ABA Standard 4.32 (suspension generally appropriate when lawyer knows of conflict of interest and does not fully disclose conflict, causing injury or potential injury to client); ABA Standard 7.2 (suspension generally appropriate when lawyer knowingly engages in conduct that violates duty owed to profession and causes injury or potential injury to client, public, or legal system).

5. *Case Law*

The Bar relies solely on this court's case law involving intentional violations of DR 1-102(A)(3) (or its predecessor, DR 1-102(A)(4)) for its argument that the accused should be disbarred. The Bar identifies no cases that are relevant to determining the appropriate sanction for the violations at issue here: knowing failure to disclose fully a client conflict of interest, negligently charging or collecting an excessive fee, and negligently converting client funds.

---

[3] Although failure to make restitution may be considered as an aggravating factor under ABA Standard 9.22(j), we find no authority, and the Bar does not identify any, for the trial panel's order that "the accused make restitution of $375 to the parties who paid his fees in the Yother matter."

[4] As noted, the accused raised delay as an affirmative defense to the charges. Under ABA Standard 9.32(j), delay may be considered as a mitigating factor, but it is not an affirmative defense.

In *In re Hockett*, 303 Or 150, 164, 734 P2d 877 (1987), this court explained that a violation of DR 5-105, by itself, justifies a 30-day suspension. No lesser suspension is warranted here, as the accused's misconduct involves more than failing to disclose fully a likely current client conflict of interest. In *In re Claussen*, 322 Or 466, 487-88, 909 P2d 862 (1996), this court suspended for 12 months an experienced lawyer who violated DR 5-105 in addition to other intentional misconduct. The accused's conduct here is not as serious as the conduct in *Claussen*, suggesting that a 12-month suspension is not called for in this case. The accused's other disciplinary violations in this instance resulted from his sloppy and careless office practices, not from intentional or knowing misconduct. Nonetheless, charging and collecting an excessive fee, and converting client funds are serious ethical violations. *See In re Adams*, 293 Or 727, 740, 652 P2d 787 (1982) (60-day suspension for charging excessive fee and two other ethical violations). Lawyers should make sure to reach an early, clear understanding of fees with their clients. *See In re Potts / Trammel / Hannon*, 301 Or 57, 74, 718 P2d 1363 (1986) (so stating).

In cases where, as here, the lawyer is found to have violated DR 9-101(A), but not DR 1-102(A)(3), this court has imposed suspensions ranging from 63 days to six months, depending on the circumstances. *See In re Starr*, 326 Or 328, 348-49, 952 P2d 1017 (1998) (identifying factors in addition to violation of DR 9-101(A) affecting length of suspension). On the facts of this case, which include two other serious violations of disciplinary rules, we conclude that a suspension of four months, to run consecutively to the accused's previous three-year suspensions, is the appropriate sanction.

The accused is suspended from the practice of law for four months, with the period of suspension to run consecutively to the period of suspension imposed on the accused in *In re Wyllie*, 327 Or 175, 957 P2d 1222 (1998).