Argued and submitted January 7, accused suspended for four months
April 29, 1999

# In re Complaint as to the Conduct of
# GEORGE WITTEMYER,
*Accused.*

# (OSB 95-190; SC S45376)

980 P2d 148

George Wittemyer, Portland, argued the cause and filed a brief *in propria persona*.

Jane E. Angus, Assistant Disciplinary Counsel, Oregon State Bar, Lake Oswego, argued the cause and filed a brief on behalf of the Oregon State Bar.

PER CURIAM

**PER CURIAM**

In this lawyer discipline proceeding, the Oregon State Bar charged the accused with violating Code of Professional Responsibility Disciplinary Rule (DR) 5-101(A) (accepting or continuing employment when the exercise of judgment on behalf of the client is or may be affected by business, property, or personal interests) (three counts); DR 5-104(A) (entering into a business transaction with a client in which the lawyer and client have differing interests); and DR 5-105(E) (representing multiple clients with conflicting interests). A trial panel of the Disciplinary Board found that the accused had committed all the alleged violations and determined that the appropriate sanction was suspension from the practice of law for four months.

The Bar sought review under ORS 9.536(2) and Bar Rules of Procedure (BR) 10.1 and 10.4, contending that the trial panel's sanction was insufficient and that the accused should be suspended for one year. The accused disputed the trial panel's determinations as to two of the alleged violations of DR 5-101(A) and argued that the appropriate sanction was a reprimand.

Our review is *de novo*. ORS 9.536(3); BR 10.6. The Bar has the burden of proving by clear and convincing evidence that the accused committed the charged violations. ORS 9.536(1); BR 5.2. We conclude that the accused committed all the alleged violations and that the appropriate sanction is, as the trial panel determined, suspension from the practice of law for four months.

## DISCIPLINARY RULE VIOLATIONS

We find the following facts to have been proved by clear and convincing evidence. Pacific Chips was incorporated in April 1989 by Harry Kane and David Fairbairn. The company was created to process and sell hardwood timber from the Pacific Northwest. Kane recruited the accused to be Pacific Chips' legal counsel, secretary, and registered agent. The accused served in those capacities until July 1991, when Pacific Chips was dissolved. The accused was granted stock in Pacific Chips in August 1989, following assumption of his legal duties for the company.

Before representing Pacific Chips, the accused had represented Robert Harrington in litigation and business matters. While representing Harrington, the accused became acquainted with Harrington's wife, Gloria Harper. Harrington died in 1988. In early 1989, the accused began representing Harper in various legal matters, including several collection actions and the drafting of her will. The accused was then a widower. In mid-1989, the accused and Harper began a romantic relationship, which continued until mid-1990.

Harper became acquainted with Kane and Fairbairn through the accused. In the fall of 1989, Kane and Fairbairn asked Harper to loan Pacific Chips $300,000 to cover unanticipated costs of starting their business.[1] Harper consulted the accused, who encouraged her to make the loan.[2] Harper and the accused met with Kane and Fairbairn to discuss the loan and to tour the Pacific Chips mill in Roseburg.

Still undecided whether to make the loan, Harper asked the advice of Norman Fenton, a business associate. Fenton suggested that Harper loan Pacific Chips only half the amount that Kane and Fairbairn had requested, $150,000, on condition that the accused loan Pacific Chips an equal amount. Harper suggested that investment to the accused, who agreed. That agreement never was reduced to writing, however.

---

[1] The trial panel found that the accused arranged the meeting between Harper, Kane, and Fairbairn so that Harper could be solicited for the loan. Our review of the record suggests otherwise. Evidence for the trial panel's finding is found in Harper's deposition. The accused denies the scenario described in Harper's deposition, and we find the accused's version of events at this juncture to be more likely and therefore more credible, because there is ample independent testimony favoring the accused's version and none favoring Harper's version. Specifically, Kane testified that he and Fairbairn first approached Harper about the loan on their own, without any help from the accused and, indeed, without informing the accused of their plans. In other words, Kane's testimony directly supports the accused's version of this part of the story and controverts Harper's. The trial panel made no finding that Kane was not credible. Moreover, Harper's deposition on this point is not convincing. She had little memory of the details of the meeting—date, location, etc.

[2] The accused denies encouraging Harper to make the loan; nonetheless, he acknowledges his own belief that Pacific Chips was an extremely successful operation and that being Pacific Chips' attorney would make him wealthy at the time he and Harper were romantically involved.

Harper and the accused frequently discussed the venture, and Harper relied on the accused's expertise and knowledge of Pacific Chips' financial status in making the loan. She also relied on the accused's representations that Pacific Chips had sufficient security for the loan in the form of unmilled logs. The accused also advised Harper that he believed that Kane and Fairbairn, who had agreed to guarantee payment of the loan, would satisfy the loan if the company defaulted.

Before the loan was made, the accused and Harper were talking with another lawyer, Phillip Cobb. In Cobb's presence, the accused jokingly told Harper that Cobb had told him that he should write a letter to Harper explaining the potential conflict of interest stemming from the loan. The accused did not write such a letter.

The $300,000 loan closed in December 1989. The accused prepared loan documents, including a promissory note, a security agreement granting Harper an interest in Pacific Chips' unmilled logs, and a UCC financing statement. All documents described Harper as the sole creditor on the loan. The accused told Harper that he prepared the documents in her name alone because "it would just look better" if his interest in the loan were not disclosed. The accused never disclosed his participation in the loan to anyone at Pacific Chips, and there is no evidence that anyone at Pacific Chips knew of his participation when the loan documents were signed. Harper wrote the accused a check for $150,000, which the accused placed in his client trust account. The accused then drew a check for $300,000, payable to Pacific Chips.

The loan was structured such that Pacific Chips would make interest-only payments in January, February, and March of 1990 and commence monthly payments of interest and principal in April of that year. However, by April 1990, Pacific Chips was experiencing financial difficulties. The accused informed Harper that Pacific Chips might default on the loan and suggested that they continue to accept interest-only payments for the time being, rather than suing Pacific Chips on the note. Harper agreed. In an effort to protect his and Harper's interest in the loan, the accused filed a UCC-1 financing statement on April 20, 1990, securing

Pacific Chips' unmilled logs as collateral for the loan. Pacific Chips made interest-only payments on the loan through August 1990 and then stopped making payments.

Between April and November 1990, the accused took other action to secure repayment of the loan. He wrote a letter to another lender, Equifax Mortgage, ostensibly on behalf of Pacific Chips, explaining the terms of the loan, and mailed a copy of that letter to Harper. He also wrote a letter to Harper, ostensibly on behalf of Pacific Chips and apparently as a mediator between Pacific Chips, Kane, and Harper, regarding proposed future payments to Harper in consideration for Harper's agreement to delay proceeding against Kane as guarantor. That letter stated in part: "I appreciate your courtesy and cooperation in allowing me to mediate this matter with Pacific Chips, Harry Kane, yourself and your attorney." At the time, Harper was represented in this matter only by the accused. Harper testified that she believed the reference in the letter to "your attorney" was a reference to the accused himself. In October and November 1990, the accused, acting in his capacity as Pacific Chips' lawyer, wrote to Fairbairn and Ralph Johnson, an investor who had assumed management of Pacific Chips, reminding them of Harper's security interest in the company's unmilled logs. Those letters also referred to Harper's "attorney" in the third person at a time when the accused was the only lawyer representing Harper in the matter.

In November 1990, the accused engaged another lawyer, Richard Uffelman, to attempt to collect on the loan. The accused and Harper each agreed to pay one-half of Uffelman's fee. Uffelman was directed to charge Harper his full fee but to send his bill to the accused. The accused would then send half the money owing to Harper, who would pay Uffelman in full.

Uffelman and the accused agreed that the accused would assist with the collection, so as to limit the amount of Uffelman's fee. Harper eventually decided to sue to collect on the loan. The accused prepared the draft complaint in Harper's collection action, which Uffelman filed. The accused also prepared draft letters from Uffelman to Fairbairn's counsel about the loan.

At the same time, the accused was attempting to sell unmilled logs in Pacific Chips' inventory to satisfy the loan. The accused directed Uffelman to delay filing the complaint in Harper's collection action until the accused was certain that the recovery from log sales would be insufficient to satisfy the loan. The proceeds of the log sales ultimately fell far short of the amount owing, and Uffelman filed the complaint in March 1991. The accused accepted service of the complaint on behalf of Pacific Chips. The complaint sought recovery of $300,000 plus interest, as well as punitive damages, in Harper's name only, and did not reveal the accused's participation in the loan. The accused told Uffelman that the reason for proceeding in Harper's name only was that, in the event that less than half of the amount due was recovered, the entire recovery would go to Harper, rather than being divided between Harper and the accused as co-creditors.

In July 1991, Uffelman obtained a default judgment against Pacific Chips for $300,000 plus interest, $50,000 in punitive damages, and costs and attorney fees. At the time, Pacific Chips had no assets with which to satisfy the judgment. The accused asserts that he allowed the default because Pacific Chips had no colorable defense and because corporate officers had consented to the judgment.

In late 1991, Harper discharged Uffelman and hired other counsel to pursue collection of the judgment. She then voluntarily reduced the amount of her judgment against Pacific Chips by $150,000 to reflect the accused's participation in the loan. Harper's efforts to collect on the loan eventually involved her in bankruptcy actions filed on behalf of Pacific Chips and Kane. In 1993, Harper also filed a malpractice claim against the accused and Uffelman. Harper died in November 1995, but her estate continued to pursue claims against Pacific Chips, the loan guarantors, their bankruptcy estates, Uffelman, and the accused. Her estate eventually recovered over $162,000 in the Kane bankruptcy and nearly $6,000 in the Pacific Chips bankruptcy, but incurred substantial legal fees and failed to recover most of the interest that had accrued on the loan. Harper's malpractice claims against the accused and Uffelman eventually settled.

The accused recovered about $25,000 of the $150,000 that he had loaned Pacific Chips. Although he served as Pacific Chips' counsel between 1989 and 1991, and billed the company for more than $63,000 for his work during that period, the accused received no payment for his services.

This proceeding against the accused followed. The accused does not dispute the trial panel's finding that he committed the violations detailed in the first and fourth causes of the Bar's complaint. In the first cause of the complaint, the Bar alleged that the accused violated DR 5-101(A)[3] and DR 5-104(A)[4] by holding an undisclosed interest as creditor on an interest-bearing loan to Pacific Chips, his client. In the fourth cause of the complaint, the Bar alleged that the accused violated DR 5-105(E)[5] by simultaneously representing Pacific Chips and Harper. We conclude that the evidence in the record leaves no doubt that the accused committed those violations.

The accused disputes the trial panel's finding that he committed the violations alleged in the second and third causes of complaint. In the second cause, the Bar alleged that the accused violated DR 5-101(A) by representing Harper in the loan transaction. As relevant, DR 5-101(A) provides:

"Except with the consent of the lawyer's client after full disclosure:

---

[3] DR 5-101(A) provides, in part:

"Except with the consent of the lawyer's client after full disclosure,

"(1) a lawyer shall not accept or continue employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own financial business, property, or personal interests. * * *"

[4] DR 5-104(A) provides:

"A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise the lawyer's professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

[5] DR 5-105(E) provides, in part:

"* * * * *

"Current Client Conflicts - Prohibition. Except as provided in DR 5-105(F), a lawyer shall not represent multiple current clients in any matters when such representation would result in an actual or likely conflict."

"(1)   a lawyer shall not accept or continue employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own financial business, property, or personal interests."

The trial panel found that the accused violated DR 5-101(A)(1), because the exercise of his professional judgment on Harper's behalf was or reasonably might have been affected by his own financial interests in the loan, by his representation of Pacific Chips, and by his romantic relationship with Harper.

■       The accused first disputes the trial panel's conclusion that he was Harper's lawyer in the loan transaction. He argues that he and Harper were partners in the transaction and that Harper neither intended that he represent her in that matter nor relied on his advice in making the loan.

■       On *de novo* review, we agree with the trial panel that the accused acted as Harper's lawyer in the loan transaction. The existence of a lawyer-client relationship may be inferred from the circumstances and the conduct of the parties, and does not depend on a formal agreement. *In re Hassenstab*, 325 Or 166, 172, 934 P2d 1110 (1997). In *In re Weidner*, 310 Or 757, 770, 801 P2d 828 (1990), this court held that a lawyer-client relationship may be found to have existed based on the putative client's objectively reasonable belief that the relationship had been established. To establish a lawyer-client relationship on that basis, the putative client's subjective belief must be accompanied by evidence showing "that the lawyer understood or should have understood that the relationship existed, or acted as though the lawyer was providing professional assistance or advice on behalf of the putative client * * *." *Ibid.*; *see also In re Brown*, 326 Or 582, 599-601, 956 P2d 188 (1998) (illustrating proposition).

In a deposition taken in her malpractice action against the accused, Harper stated that she believed that the accused was her lawyer in the loan transaction and that she had relied on his advice. The accused argues that Harper's statements were lies. The trial panel, however, explicitly found that Harper's deposition testimony was credible. We find no reason to disagree with the trial panel's finding on

that point. Accordingly, we find that Harper subjectively believed that the accused was acting as her lawyer in the loan transaction.

■  The question remains whether that belief was objectively reasonable. We conclude that it was. The accused encouraged Harper to make the loan, made representations to her about the financial status of Pacific Chips and of the loan guarantors, and prepared a promissory note, security agreement, and UCC financing statement in Harper's name. Further, the accused represented Harper in other, unrelated, matters immediately before and after the loan transaction, a fact that reasonably could have reinforced Harper's belief that the accused was representing her in the loan matter. *See, e.g., Brown,* 326 Or at 599 (finding client's belief of existence of lawyer-client relationship reasonable under similar circumstances). We find that, under the circumstances, it was objectively reasonable for Harper to believe that the accused was acting as her lawyer in the loan transaction.

■  The accused also argues that, assuming that he did represent Harper in the loan transaction, that representation did not violate DR 5-101(A). That argument is based on the assertion that his exercise of professional judgment on Harper's behalf was not actually or potentially affected by his own financial, business, property, or personal interests. The accused's argument is not well taken.

DR 5-101(A)(1) prohibits a lawyer from accepting or continuing representation if the exercise of professional judgment "will be or reasonably may be affected" by the lawyer's own interests. The accused knew that he had business and personal interests in the loan as Pacific Chips' lawyer and as a creditor. He knew, or should have known, that his interests reasonably might be affected in his representation of Harper. Under the circumstances, the accused was required either to decline to represent Harper or to obtain her consent after full disclosure of any possible conflict of interest. In failing to do either, he violated DR 5-101(A).

■  The third cause of the complaint alleged that the accused violated DR 5-101(A) by representing Harper in her efforts to secure collateral and collect on the loan after Pacific

Chips defaulted. The trial panel found that the accused violated DR 5-101(A) by representing Harper in the loan collection at a time when his exercise of professional judgment on her behalf would or reasonably might be affected by his simultaneous representation of Pacific Chips and by his personal interest in collecting the loan. The accused argues that he did not represent Harper in the loan collection.

We agree with the trial panel and find by clear and convincing evidence that the accused violated DR 5-101(A) as alleged in the third cause of the complaint. First, the record demonstrates that the accused represented Harper in the loan collection. Harper subjectively believed that the accused was representing her in the collection and that belief was objectively reasonable, because the accused "acted as though [he] was providing professional assistance or advice on behalf of [Harper]." *In re Weidner*, 310 Or at 770. Specifically, the accused wrote the complaint in Harper's collection action against Pacific Chips and also drafted letters that Uffelman mailed as part of the effort to collect on the loan. Further, the accused told Harper and Uffelman that he would assist in her collection action.

■        We also conclude that the accused's exercise of professional judgment on Harper's behalf reasonably might have been affected by his own financial, business, property, or personal interests. First, his judgment might have been affected because he held a property interest in the loan. There clearly was a potential conflict between the accused's interest in collecting the $150,000 that he was owed and his professional duty as Harper's lawyer to attempt to collect the $150,000 that she was owed, especially because he knew that Pacific Chips had insufficient assets to pay its creditors. Nor could the accused remedy that conflict by placing Harper's interests ahead of his own, as he asserts that he did. DR 5-101(A)(1) required the accused to decline to represent Harper or to obtain her consent after full disclosure. Because he failed to do either, he violated DR 5-101(A). We also find that it is clear on this record that the accused's exercise of professional judgment on Harper's behalf reasonably might have been affected by his business interest as counsel for the debtor, Pacific Chips.

In summary, we agree with the trial panel that the accused committed the violations charged in the Bar's complaint. We turn to the appropriate sanction for the accused's multiple violations.

## SANCTION

■ The purpose of lawyer discipline is not to punish the lawyer, but to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to discharge properly their professional duties to clients, the public, the legal system, and the legal profession. American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards), Standard 1.1; *see also In re Murdock*, 328 Or 18, 24, 968 P2d 1270 (1998) (to the same effect). In determining the appropriate sanction for the violations committed, this court consults the ABA Standards and Oregon case law. *In re Martin*, 328 Or 177, 191, 970 P2d 638 (1998). The court considers the nature of the ethical duty violated, the accused's mental state at the time of the misconduct, the extent of the actual or potential injury caused by the accused's misconduct, and any mitigating or aggravating circumstances. ABA Standard 3.0; *Martin*, 328 Or at 191.

The accused committed three violations of DR 5-101(A) and one violation each of DR 5-104(A) and DR 5-105(E). In all of those violations, the accused violated his duty to his clients to avoid conflicts of interest. ABA Standard 4.3.

■ With respect to the violation of DR 5-104(A), we conclude that the accused's conduct was intentional, as evidenced by his purposeful concealment from his client, Pacific Chips, of his interest in the loan. As to the other violations, we conclude that the accused acted knowingly, that is, with "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards at 7.

■ We may consider both actual and potential injuries in determining the appropriate sanction. *In re Devers*, 328 Or

230, 242, 974 P2d 191 (1999). The accused's violations in his representation of Harper caused her actual injury. She was forced into protracted litigation in an attempt to collect on her loan to Pacific Chips. Although she eventually recovered the principal, she incurred substantial legal fees in doing so and never recovered the majority of the interest that she was owed on the loan. The violations arising from the accused's representation of Pacific Chips caused the company potential injury.

■■ In determining an appropriate sanction, we draw together the factors of duty, mental state, and injury and consult the ABA Standards for guidance. *Martin*, 328 Or at 192. Considering those factors together, we conclude that the accused's misconduct implicates ABA Standard 4.32, which provides:

> "Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client."

Suspension clearly would be an appropriate sanction in this case. We next consider aggravating and mitigating factors to determine whether that sanction should be imposed. *Devers*, 328 Or at 243.

■ We find the following aggravating factors: substantial experience in the practice of law (ABA Standard 9.22(i)); multiple offenses (ABA Standard 9.22(d)); and a pattern of misconduct (ABA Standard 9.22(c)). We find the following mitigating factors: cooperative attitude toward the proceedings (ABA Standard 9.32(e)); and absence of a prior disciplinary record (ABA Standard 9.32(a)). In view of the fact that the accused has practiced law for more than 30 years, the lack of a prior disciplinary record is a strong mitigating factor. *In re Schaffner*, 323 Or 472, 480, 918 P2d 803 (1996).

Taken together, the aggravating and mitigating factors do not alter our preliminary conclusion that suspension is the appropriate sanction in this case. The remaining consideration is this court's case law. Our review of the case law

leads us to conclude that the trial panel's proposed suspension of four months is consistent with the sanctions imposed in previous cases.

We have imposed a wide range of sanctions, depending on the circumstances of each case, in discipline proceedings in which the lawyer violated DR 5-101, DR 5-104, and DR 5-105. *See In re Moore*, 299 Or 496, 703 P2d 961 (1985) (one-year suspension); *In re Baer*, 298 Or 29, 688 P2d 1324 (1984) (60-day suspension); *In re Stevenson*, 297 Or 452, 683 P2d 550 (1984) (12 violations, stipulated two and one-half year suspension); *In re Scott*, 294 Or 606, 660 P2d 157 (1983) (reprimand). We also are guided in this proceeding by the following cases: *In re Morris*, 326 Or 493, 953 P2d 387 (1998) (120-day suspension for veteran lawyer with no prior disciplinary record who violated rules governing conflicts, dishonesty, and false statements of fact); *In re Melmon*, 322 Or 380, 908 P2d 822 (1995) (90-day suspension for inexperienced lawyer who violated rules governing conflicts and dishonesty); and *In re O'Byrne*, 298 Or 535, 694 P2d 955 (1985) (four-month suspension for lawyer who violated rules governing conflicts).

The Bar argues that the four-month suspension imposed by the trial panel is insufficient under *O'Byrne*. In *O'Byrne*, this court discussed the sanctions imposed in previous disciplinary proceedings involving conflicts of interest and observed:

> "[T]his court has drawn a line between cases in which the lawyer is guilty of only a conflict of interest and cases in which the conflict has been aggravated by fraud, dishonesty or misappropriation of funds. In the former class of cases, the sanctions have been a public reprimand or a suspension for less than one year. In the latter class of cases, the suspensions have exceeded one year and in one case, permanent disbarment was ordered."

298 Or at 551. Although the accused was not charged here with conduct involving dishonesty under DR 1-102(A)(3), the Bar argues that his conduct nevertheless was dishonest. According to the Bar, that dishonesty, combined with the

conflicts of interest of which the accused is guilty, mandates a suspension of one year or longer under *O'Byrne*.

■ Assuming, without deciding, that the Bar is correct that the accused's conduct in this case constituted dishonesty, we disagree that *O'Byrne* announced a rule of law applicable to such circumstances. *O'Byrne* did not purport to create a framework governing lengths of suspensions; it merely summarized the range of sanctions that had been imposed in similar cases and selected a sanction that, in light of the evidence, appeared to be appropriate. *O'Byrne* illustrates the general proposition that conflicts of interest are punished more severely when aggravated by dishonesty.[6] However, the appropriate sanction in each discipline proceeding always depends on the facts and circumstances of that proceeding.

Our cases since *O'Byrne* demonstrate that this court has treated the quoted text from that case as a summary of prior sanctions, not a bright-line rule. In some proceedings, we have imposed suspensions of one year or more for conflicts of interests accompanied by dishonesty. *See, e.g., In re Claussen*, 322 Or 466, 909 P2d 862 (1996) (one-year suspension for conflict of interest aggravated by conduct involving dishonesty in violation of DR 1-102(A)(3)). In other such proceedings, however, we have imposed shorter suspensions. *See Morris*, 326 Or at 493 (120-day suspension for conflict of interest aggravated by "misrepresentation" in violation of DR 1-102(A)(3)); *Melmon*, 322 Or at 380 (90-day suspension for conflict of interest aggravated by conduct involving dishonesty in violation of DR 1-102(A)(3)); *In re Hockett*, 303 Or 150, 734 P2d 877 (1987) (63-day suspension for conflict of interest aggravated by conduct involving dishonesty in violation of DR 1-102(A)(3)). In those proceedings, as here, the sanctions reflected our analysis of the individual facts and circumstances of the case. *O'Byrne* provides guidance in that analysis but, contrary to the Bar's assertion, does not establish a minimum period of suspension in this class of proceedings.

---

[6] This court has never cited *O'Byrne* to justify a suspension of one year or more for conflicts of interest aggravated by dishonesty in a proceeding in which the accused was not charged with misappropriation of funds or conduct involving dishonesty or misrepresentation under DR 1-102. As noted, the accused was not so charged in this proceeding.

Considering the facts and circumstances of this case, we conclude that a four-month suspension is the appropriate sanction.

The accused is suspended from the practice of law for a period of four months, commencing 60 days from the date of filing of this decision.