Argued and submitted August 13, 2015, reversed and remanded on securities
fraud claim, otherwise affirmed February 18, 2016

Elizabeth LAHN,
*Plaintiff,*
*and*

Alexis SCHARFF,
individually and as assignee of rights
and claims of Elizabeth Lahn;
and Alexis Scharff as Trustee of the
Alexis G. Scharff Revocable Trust,
*Plaintiffs-Appellants,*

*v.*

Edward Daniel VAISBORT,
*Defendant-Respondent,*
*and*

Bennett H. GOLDSTEIN,
Mark Knapp, and Peter Scharff,
*Defendants.*

Deschutes County Circuit Court
10CV0382ST; A154575

369 P3d 85

Barton C. Bobbitt argued the cause and filed the briefs
for appellants.

Peter Hawkes argued the cause for respondent. On the brief were Thomas W. Sondag and Lane Powell PC.

Before Duncan, Presiding Judge, and DeVore, Judge, and Flynn, Judge.

DEVORE, J.

**DEVORE, J.**

Plaintiff Alexis Scharff appeals from a judgment entered for defendant Edward Vaisbort after the trial court granted his motion for summary judgment against plaintiff's claims for breach of contract, professional negligence, and securities fraud.[1] Her claims arose when she provided a renewed loan to a real estate entity, then learned, upon its default, that her loan was essentially unsecured. Defendant had drafted the transaction documents.

As to each of her claims, plaintiff separately assigns error to the trial court's decision to grant summary judgment. We reject without written discussion plaintiff's assignment regarding her breach of contract claim. As to her negligence and securities claims, we address several issues: first, whether there was evidence from which a reasonable juror could find that plaintiff had a lawyer-client relationship with defendant; second, whether plaintiff's securities claim was barred by the statute of limitations; and, third, whether plaintiff's note could constitute a security. For the reasons below, we reverse and remand on plaintiff's securities fraud claim, and otherwise affirm.

## I. FACTS

"We take the following facts from the summary judgment record, viewing the facts and all reasonable inferences that may be drawn from them in the light most favorable to plaintiff, as the nonmoving party." *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 332, 83 P3d 322 (2004). Plaintiff alleged a substantial history of loan transactions culminating in an ill-fated loan renewal. In prior transactions, defendant, a California attorney, had represented plaintiff and other lenders, although in the ill-fated transaction, his communication and documents declared that he represented only plaintiff's brother, Peter Scharff (hereafter "Scharff"), who played a key role among three lenders.

---

[1] Alexis Scharff appears individually and as trustee of the Alexis G. Scharff revocable trust, an entity that is also a party to this appeal. Elizabeth Lahn was also a plaintiff, but her interests were subsequently assigned to plaintiff Scharff. For ease of reference, we refer only to "plaintiff." Plaintiff named several defendants in her complaint, but only Vaisbort is a respondent on appeal. Accordingly, we refer only to "defendant."

Beginning in the 1990s, plaintiff, Scharff, and Elizabeth Lahn made a series of private loans to Dorn-Platz Properties, a California-based development corporation (hereafter "Dorn-Platz" or "borrower"). An investment broker working on behalf of Dorn-Platz had approached lenders to put together the transactions. In addition to participating as a lender, Scharff acted as an agent for plaintiff and Lahn by negotiating and closing the loans. Scharff "reviewed and made recommendations as to the making of the loans," held power of attorney, and "maintained all the documents and records" for plaintiff. Plaintiff did not independently review documents to ensure that the loans were secured because she relied solely on her brother's judgment. Defendant prepared loan documents and represented the group of lenders in some of the transactions with Dorn-Platz.[2] Defendant began representing plaintiff in 1997.

In November 2003, loans from plaintiff and other lenders to Dorn-Platz were coming due. The borrowers' broker encouraged plaintiff and the other lenders to roll over their outstanding loans into new loans to Dorn-Platz.[3] The broker explained that defendant would "represent the lenders and prepare the documents" for a new loan for development of "The Round," a mixed-use property in Beaverton. The lenders were presented with the opportunity either to end or to increase their loans to Dorn-Platz. Scharff recommended to plaintiff and Lahn that they extend their loans. Plaintiff, Scharff, and Lahn rolled their loans over and, at the same time, increased the amount of their loans.

In January 2004, Scharff, on behalf of plaintiff, signed an "Inter Creditor Agreement" for her rollover loan to Dorn-Platz. The collateral for the loan was described as a note "that was originally given to CHUO Bank and Trust by *** [Mr. Platz]," an interest in the Round, and real property

---

[2] When representing lenders in Oregon, defendant worked with local counsel, Goldstein. Plaintiff alleged claims against Goldstein in her complaint, but he is not a party to this appeal.

[3] Lenders were regularly encouraged to roll over their loans into new loans to Dorn-Platz. Plaintiff testified that the majority of her loans to Dorn-Platz "rolled into another loan."

owned by Platz in California.[4] A loan summary advised that the lenders would be "represented by [defendant] who will draw all the documents and do all the legal work."[5]

In October 2004, the lenders received another memorandum from the broker urging yet another loan rollover with Dorn-Platz. The broker stated that, "[b]asically, the partners are 'splitting the sheets.'" The broker declared, "If you want out, we need to know right away. If you want to add money we need to know right away. Peter Scharff is putting in $100,000 more. *** Our attorney, [defendant], will do the documents. This must close before Christmas." A loan summary prepared in December described the new loan arrangement as a "Rollover/Recast" of the January 2004 loan.[6] The rollover/recast arrangement entailed the lenders' release of the Chuo note and the real property in California, in exchange for Dorn-Platz's minority partnership interest in The Round development project. The loan summary indicated that the lenders would be able to record a trust deed on three undeveloped commercial lots at an unspecified time "[a]fter closing" but did not otherwise provide for the lenders' security in real property. The agreement extended the loan term until 2010, a period of 60 months, at an interest rate of 12 percent.[7]

In January 2005, plaintiff and defendant exchanged email communications in which defendant provided plaintiff

---

[4] Hereinafter, that note is referred to as "the Chuo note." The Chuo note had a collateral value of $1,500,000.

[5] The parties do not dispute that defendant represented plaintiff on that 2004 rollover loan to Dorn-Platz.

[6] The loan "overview" provided in the loan summary states:

"The partners in The Round, [Dorn-Platz] and LB Beaverton, LLC (Lehman Brothers), are 'splitting the sheets'. [Dorn-Platz] will get the North Site, everything North of the Light Rail Line. They will acquire it with $11,000,000 to $11,500,000 in secured debt, which will include $500,000 to $1,000,000 interest reserve. At closing, the partnership will have a total capital account of $6,000,000, which will include +$2,000,000 cash."

In the agreement, Dorn-Platz took 43 unsold condominiums, and 25,000 square feet of retail space, approximately half of which was leased and occupied by retailers at that time. There were three additional lots on the site approved for commercial development. However, Dorn-Platz had not yet found a tenant or started any construction on those lots.

[7] Plaintiff alleged that the lenders were unaware that they had never received the Chuo notes following the first rollover loan in 2004 and were unaware that

with a new "Inter Creditor Agreement" for the proposed rollover/recast loan to Dorn-Platz. Defendant explained in an email to plaintiff that "[t]he Inter Creditor Agreement is intended to permit Mr. Scharff to execute the necessary documents to originate the proposed loan and subsequent to funding act as the lead participant in connection with any enforcement issues." Defendant stated, "You are encouraged to seek independent counsel to review these and any documents in connection with this matter. Please remember, as it is expressly stated in the Inter Creditor Agreement, *we are representing Mr. Scharff in the transaction.*" (Emphasis added.) In that email chain with plaintiff, plaintiff referred to other counsel of her own but wrote that her attorney had not "assigned the original loan to [her] trust." As part of the transaction-related documents, defendant offered to revise the power of attorney forms to involve Scharff as to plaintiff's trust and to provide an acknowledgement form for plaintiff's trust. Doing so, he explained, would avoid the trouble of revising and redistributing the Inter Creditor Agreement to all of the lenders. Defendant provided plaintiff with the forms granting Scharff powers of attorney and requested that plaintiff notarize and return them.

Plaintiff, Scharff, and Lahn all signed the second "Inter Creditor Agreement" reflecting the new loan summary for the rollover/recast loan and, for the second time, significantly increased the amount of their loans to Dorn-Platz.[8] Plaintiff increased the amount of her loan by $125,000 by rolling over another of her loans to Dorn-Platz ("San Fernando Retail Rollover"). The Inter Creditor Agreement recounted that Scharff, with "Limited Special Powers of Attorney," would execute the loan documents on

---

defendant was representing other investors with an adverse interest in those notes.

In the meantime, Dorn-Platz experienced financial difficulty in developing The Round on schedule and became involved in a development dispute with the City of Beaverton. The city ultimately made a claim against a $500,000 performance bond posted by Dorn-Platz. Plaintiff alleged that she was unaware of those financial circumstances.

[8] Thirteen separate lenders from Oregon and California were included in the Inter Creditor Agreement for the 2005 rollover/recast loan.

behalf of the lenders, including plaintiff. The agreement also contained the following provisions:

> "12. Waiver of Potential or Actual Conflict. Each of the Parties understands and expressly agrees that [defendant] has represented Scharff[9] in connection with this transaction and the preparation of certain documents including this Agreement. The Parties further agree that [defendant], *acting solely as counsel for Scharff,* shall prepare documents related to the Loan, that [defendant's] firm shall *continue solely to represent Scharff in connection with the Loan,* and that to the extent such representation creates any potential or actual conflict of interest, Scharff and the Parties hereby waive such conflict of interest.

> "13. Review by Independent Counsel. Each of the undersigned is and has hereby been *advised to obtain separate and independent legal and business [advice] from their own lawyers,* accountants and advisors concerning this Agreement and all transactions contemplated herein or in connection with the Loan, and the signers hereof have done so or have deliberately and independently refrained from doing so."

(Emphases added.)

The loan eventually closed in June 2005. The trust deed was never recorded as to the three commercial lots that had been promised as collateral "after closing," leaving the lenders' loans unsecured by any real property. By that time, plaintiff had loaned $400,000 to Dorn-Platz, and Lahn had loaned $500,000. In January 2008, Dorn-Platz began to miss payments and to issue checks to the lenders drawn on insufficient funds. In December 2009, the lenders were informed that their loans were unsecured and that Dorn-Platz was unable to repay them.[10]

Plaintiff filed a complaint alleging, among other things, that defendant had negligently represented her in relation to the 2005 loan agreement. Plaintiff specified numerous failures, including failures to investigate, failures to advise, failures to provide copies of communications, and

---

[9] In the agreement, "Scharff" is identified as Peter Scharff.

[10] Ultimately, secured lenders foreclosed upon Dorn-Platz's property. Plaintiff's loan to Dorn-Platz effectively became uncollectable.

failures to disclose. She also alleged that defendant had violated Oregon's securities law. She alleged violations of ORS 59.135(1), (2), and (3) by materially aiding in making untrue statements when circulating false loan summaries, failing to disclose several circumstances, and failing to disclose that the trust deed for real property was not obtained as part of the transaction. Plaintiff declared that she did not realize that Dorn-Platz had defaulted on its development contract with the City of Beaverton in 2004 until after she had signed the 2005 Inter Creditor Agreement, and she declared that she did not realize that her loan was not secured by real property until December 2009.

Defendant moved for summary judgment, contending, among other things, that (1) defendant did not represent plaintiff on the 2005 loans, (2) the professional negligence and security claims were time barred, and (3) the 2005 loan did not involve a security.

As to defendant's first argument, plaintiff responded that a question of material fact remained as to whether defendant continued to represent her on the 2005 loan. She contended that the Inter Creditor Agreement and defendant's email were not dispositive on that issue. As to any statute of limitations, plaintiff relied on belated discovery of the claims. As for defendant's third argument, plaintiff responded that the transaction constituted a security. She argued that, "whether a particular note is a security is a fact-based analysis," and the facts supported a determination that the transaction was a security in the form of a "note" or "investment contract." Finally, plaintiff contended that facts, not law, must determine whether defendant aided any securities violation.

The trial court granted defendant's motion for summary judgment as to all of plaintiff's claims. The court did not explain the bases for its rulings.

## II.   PROFESSIONAL NEGLIGENCE CLAIM

On appeal, plaintiff first assigns error to summary judgment against the malpractice claim, arguing that a rational factfinder could determine that defendant and plaintiff had a lawyer-client relationship at the time of plaintiff's

2005 rollover/recast loan to Dorn-Platz. That determination, she suggests, is supported by a number of circumstances. Plaintiff points to email communications with defendant, in which she wrote that her trust, not she herself, should be the lender. Defendant had offered to insert appropriate language into the power of attorney document (in which Scharff would execute documents on her behalf) and to send plaintiff "a very brief document adopting, for [her] trust." She notes that the title officer for the 2004 and 2005 loans declared that defendant had acted as the lenders' counsel in those transactions.[11] She notes the email from the borrower's broker stating that defendant would prepare the loan documents for the 2005 Inter Creditor Agreement. She also notes that an email from defendant to the broker stated that he wanted "to ensure that the lenders receive actual, enforceable collateral as part of [the 2005] modification." Well after this transaction, she notes, defendant wrote a letter in 2007 to Dorn-Platz stating that he had been asked to write on behalf of "the group known as the 'Scharff Lenders'" to inquire about the status of The Round and the loan repayment. And, plaintiff adds that defendant represented her in a later, unrelated transaction after the Dorn-Platz loan. Plaintiff does not contend that there is any basis for her negligence claim against defendant apart from proving the existence of an attorney-client relationship in 2005.

Defendant argued that he was not plaintiff's lawyer on the 2005 loans, defendant relying on the Inter Creditor Agreement and his email to plaintiff. Both encouraged plaintiff to seek independent counsel and stated that he was representing only her brother, Scharff.[12] Defendant does not deny that there could be a question of fact whether plaintiff subjectively believed that she had a lawyer-client relationship as to the 2005 rollover/recast loan, but defendant insists that a rational factfinder could not conclude that plaintiff had an objectively reasonable belief that defendant was her attorney in that transaction.

---

[11] Plaintiff refers to the fact that defendant had directed the title officer to close the loan.

[12] Defendant does not dispute that he had a lawyer-client relationship with plaintiff with regard to the first, 2004 rollover loan or that he represented plaintiff in the later, unrelated loan after 2005.

        "[A]n attorney ordinarily is not liable to those out-
side of the attorney-client relationship because there is no
obligation to protect anyone outside of the attorney-client
relationship from economic losses." *Roberts v. Fearey*, 162
Or App 546, 550, 986 P2d 690 (1999). Oregon's courts have
seldom concluded that a lawyer's professional duty extends
to third parties, in the absence of a lawyer-client relation-
ship. *See id.* at 551-52 (extension of attorney's obligation to
third parties requires "circumstances that indicate the exis-
tence of a special * * * relationship that justifies imposing
a duty"); *see also Hale v. Groce*, 304 Or 281, 744 P2d 1289
(1987) (attorney failed to include intended beneficiary in
client's will); *McEvoy v. Helikson*, 277 Or 781, 562 P2d 540
(1977) (attorney for former wife undertook duty by order and
stipulation not to return passports to her without the return
of child to plaintiff).

        A lawyer-client relationship need not arise from an
explicit contract but rather "may be inferred from the cir-
cumstances and the conduct of the parties." *In re Wyllie*, 331
Or 606, 615, 19 P3d 338 (2001); *see also In re Bristow*, 301 Or
194, 201, 721 P2d 437 (1986) ("A lawyer-client relationship
does not always arise, at its inception, from a formalized
statement of terms and conditions."). A lawyer-client rela-
tionship may exist when an attorney has performed services
of the kind that are traditionally performed by lawyers, or
where a putative client has intended that the relationship be
created. *In re Weidner*, 310 Or 757, 768, 801 P2d 828 (1990).
As to the latter circumstance, the Supreme Court has con-
cluded that

    "a putative client's subjective, uncommunicated intention
    or expectation [of a lawyer-client relationship] must be
    accompanied by evidence of objective facts on which a rea-
    sonable person would rely as supporting existence of that
    intent; by evidence placing the lawyer on notice that the
    putative client had that intent; by evidence that the lawyer
    shared the client's subjective intention to form the relation-
    ship; or by evidence that the lawyer acted in a way that
    would induce a reasonable person in the client's position to
    rely on the lawyer's professional advice."

*Id.* at 770. Even when the putative client has a subjective
belief that a relationship has been established, "the putative

client's subjective belief must be accompanied by evidence that the lawyer understood or should have understood that the relationship existed." *Wyllie*, 331 Or at 615. The "reasonableness of the client's expectation of representation becomes an issue only when the lawyer denies that the relationship existed at the relevant time." *Crimson Trace Corp. v. Davis Wright Tremaine LLP*, 355 Or 476, 488, 232 P3d 980 (2014) (emphasis omitted).

Two attorney discipline cases illustrate those concepts.[13] In *In re Wittemyer*, 328 Or 448, 980 P2d 148 (1999), the putative client had made a large, unsecured loan to a company, Pacific Chips, with the encouragement of the lawyer. Pacific Chips eventually experienced financial difficulty and was unable to pay back the client's loan. In a claim against the lawyer, the client stated in a deposition that she had believed that the lawyer had represented her in the loan transaction and that she had relied on his advice. *Id.* at 456. The court recited that the lawyer had encouraged the putative client to make the loan, made representations to her about the financial status of Pacific Chips, made representations to her about the loan guarantors, and prepared a promissory note, security agreement, and UCC financing statement in her name. *Id.* at 457. Additionally, the lawyer had represented the client "immediately before and after the loan transaction, a fact that reasonably could have reinforced [the client's] belief that the [lawyer] was representing her in the loan matter." *Id.* Under those circumstances, the court concluded that the client's belief that the lawyer was representing her was objectively reasonable.

In *In re Robertson*, 290 Or 639, 646-47, 624 P2d 603 (1981), a lawyer had represented the putative clients for 15 or 16 years, assisted them in other similar land sale contract matters, was responsible for drafting the land sale contract

---

[13] We recognize that this is a professional liability case, not a discipline case, but neither party has suggested any reason—and we are aware of none—that the analysis of an attorney-client relationship would be different in the negligence context. *But see Crimson Trace Corp.*, 355 Or at 488 ("[T]here is no reason to believe that the existence of [an attorney-client] relationship for purposes of OEC 503 [the attorney-client privilege] would be determined by the same analysis that applies in the disciplinary context.").

at issue, and failed to tell the putative clients that he was not representing them on the land sale transaction at issue. The lawyer subsequently refused to permit his deposition to be taken "upon the ground that * * * to testify on deposition would violate the attorney-client privilege." *Id.* at 647. Under those circumstances, the court concluded that there was a lawyer-client relationship and that the lawyer's statements and conduct "must be regarded as admissions by him that in the transaction * * * he undertook to represent them as their attorney." *Id.* at 648.

In this case, we conclude that the trial court did not err in determining, as a matter of law, that there was no objective basis upon which a reasonable factfinder could conclude that a lawyer-client relationship existed between plaintiff and defendant in the 2005 loan transaction. To be sure, "if a lawyer-client relationship existed between the parties in the past, that fact may support the conclusion that such a relationship was intended during a subsequent contact." *In re Hassenstab*, 325 Or 166, 173, 934 P2d 1110 (1997). However, although defendant represented plaintiff in other matters, the uncontested fact remains that he told plaintiff, directly and in writing, that he represented only Scharff and that she was encouraged to seek independent counsel to review the Inter Creditor Agreement. The Inter Creditor Agreement expressly reiterated the same fact. Unlike in *Wittemyer*, there is no evidence in the record suggesting that defendant made representations to plaintiff about the financial status of Dorn-Platz or otherwise encouraged her to increase or rollover her loan in 2005. Rather, plaintiff acted in response to her brother Scharff's recommendations and relied solely on his financial judgment.

It is true that defendant provided forms to assign plaintiff's interest in the loan to her trust. The offer of those documents, however, came within the same email chain and shortly after his warning that he did not represent plaintiff for the purposes of the 2005 transaction. Further, those documents were consistent with defendant's representation of Scharff and preparation of the documents culminating in the Inter Creditor Agreement, which required approval of all the lenders, including plaintiff. In those circumstances, plaintiff's subjective belief that defendant acted as her

lawyer in the transaction is not accompanied by evidence from which a reasonable factfinder could conclude that the belief was objectively reasonable.[14]

## III. STATUTE OF LIMITATIONS

Before addressing the merits of plaintiff's securities law claim, we must address defendant's argument that the claim should fail because it was barred by the statute of limitations. ORS 59.115(6); ORS 59.137(6)(b).[15] As applied here, the question is whether, as a matter of law, plaintiff "should have discovered the facts on which the action or suit is based," more than two years before commencing this action in May 2010. ORS 59.137(6)(b).

Defendant contends that the statute of limitations had run because plaintiff did not file her complaint until May 2010, but, "by January 2008, plaintiff knew Dorn-Platz had missed or made tardy payments" and that, by "April 2008, the payments stopped altogether." Given that, defendant contends that plaintiff's claim "accrued no later than April 2008." Plaintiff contends, on the other hand, that the limitations period did not begin to run until December 2009, because it was not until then that plaintiff knew or reasonably should have known that she had

---

[14] Although plaintiff argued before the trial court that defendant indirectly represented her because he represented her agent Scharff, we do not understand plaintiff to develop that argument on appeal. We express no opinion on that matter.

[15] Both parties cite the latter statute on appeal, but in either case, the difference is immaterial; the limitation is the same. ORS 59.115(6) provides:

"Except as otherwise provided in this subsection, no action or suit may be commenced under this section more than three years after the sale. An action under this section for a violation of subsection (1)(b) of this section or ORS 59.135 may be commenced within three years after the sale or two years after the person bringing the action discovered or should have discovered the facts on which the action is based, whichever is later. Failure to commence an action on a timely basis is an affirmative defense."

Similarly, ORS 59.137(6) provides:

"An action or suit may be commenced under this section within the later of:

"(a) Three years after the date of the purchase or sale of a security to which the action or suit relates; or

"(b) Two years after the person bringing the action or suit discovered or should have discovered the facts on which the action or suit is based."

suffered harm as a result of defendant's alleged securities violation.

Although defendant points to the time that plaintiff knew that Dorn-Platz experienced financial difficulty, the timeliness of plaintiff's securities claim depends upon when plaintiff discovered, or should have discovered, that her loan was unsecured and she had suffered harm. ORS 59.115(6); ORS 59.137(6)(b). The lenders were informed that their loans were unsecured and would not be paid in December 2009. Plaintiff declared that she did not know that her loan was unsecured by real property until that time. Until then, she had believed that there would be means to collect on her loan in the event of nonpayment. Viewing the evidence in the light most favorable to plaintiff, as we must at this stage, we conclude that the record permits a reasonable fact-finder to find that her complaint was not time barred in May 2010.

## IV.  SECURITIES LAW CLAIM

Our concern lies with summary judgment on plaintiff's securities law claim. Plaintiff's complaint alleged that defendant was a person who participated or materially aided in the sale of a security "by fraud or deceit" in violation of the Oregon Securities Law set out in ORS chapter 59. ORS 59.115; ORS 59.135.[16] We understand plaintiff's theory of

---

[16] ORS 59.135 "merely establishes a standard of conduct for claims pursued under ORS 59.115, ORS 59.137, and ORS 59.255." *State Treasurer v. Marsh & McLennan Companies, Inc.*, 353 Or 1, 9, 292 P3d 525 (2012).

ORS 59.135 provides, in part:

"It is unlawful for any person, directly or indirectly, in connection with the purchase or sale of any security or the conduct of a securities business or for any person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise:

"(1) To employ any device, scheme or artifice to defraud;

"(2) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; [or]

"(3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person[.]"

ORS 59.115 provides, in part:

"(1) A person is liable as provided in subsection (2) of this section to a purchaser of a security if the person:

defendant's liability to be that defendant materially aided in the sale or solicitation of the sale of the promissory note for the 2005 rollover/recast loan "by fraud or deceit" because plaintiff was unaware that the loan was unsecured by real property when she signed the Inter Creditor Agreement.

The focus of the parties' dispute concerns whether plaintiff's 2005 loan to Dorn-Platz, in exchange for a promissory note, constitutes a security for the purpose of Oregon's securities law. Plaintiff asserts that it "could be a security either as a 'note' or an 'investment contract.'" ORS 59.015(19)(a) (defining "security"). Defendant insists that the trial court did not err because the transaction was a commercial loan rather than a security. *See Mace Neufeld Productions v. Orion Pictures Corp.*, 860 F2d 944, 947 (9th Cir 1988) ("ordinary, individually negotiated private commercial loan transactions" do not involve the purchase or sale of securities). Accordingly, viewing the underlying facts in the light most favorable to plaintiff, we consider whether defendant was entitled to judgment as a matter of law on the ground that the 2005 loan transaction did not involve a security.[17]

Under Oregon's securities law, a "security" includes, among other things, "a *note,* stock, treasury stock, bond,

---

"* * * * *

"(b) Sells or successfully solicits the sale of a security in violation of ORS 59.135(1) or (3) or by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

"* * * * *

"(3) Every person who * * * participates or materially aids in the sale is also liable jointly and severally with and to the same extent as the seller, unless the nonseller sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care, could not have known, of the existence of facts on which the liability is based. Any person held liable under this section shall be entitled to contribution from those jointly and severally liable with that person."

[17] Although the trial court did not articulate the bases on which it granted summary judgment on the securities law claim, it is possible that the court agreed with defendant's argument that the 2005 loan transaction did not involve a security. Thus, we address the merits of that argument.

debenture, evidence of indebtedness, certificate of interest or participation in a pension plan or profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferrable share, *investment contract,* [and] voting-trust certificate." ORS 59.015(19)(a) (emphases added). We conclude that, with the underlying facts viewed in the light most favorable to plaintiff, the transaction in this case constitutes a "note," and, therefore, we express no opinion as to whether the transaction might constitute an "investment contract."

In *Badger v. Paulson Investment Co., Inc.,* 311 Or 14, 21, 803 P2d 1178 (1991), the Supreme Court summarized the relationship between ORS 59.115 and federal securities law:

"ORS 59.115 is an offspring of federal security laws and regulations going back to the 1930s. *** In situations involving Oregon laws in large measure drawn from a federal counterpart, it is appropriate to look for guidance to federal court decisions interpreting similar federal laws, even though those decisions do not bind us."

*See also Computer Concepts, Inc. v. Brandt,* 310 Or 706, 714 n 7, 801 P2d 800 (1990). In this case, we refer for guidance to the United States Supreme Court opinion in *Reves v. Ernst & Young,* 494 US 56, 63-64, 100 S Ct 945, 108 L Ed 47 (1990) (involving the federal Securities Exchange Act), in which the court employed a four-factor test to determine whether a note constituted a security. *See Pratt v. Kross,* 276 Or 483, 487, 555 P2d 765 (1976) ("The definition of a 'security,' which substantially parallels the definition in most other acts, is encompassed within ORS 59.015(13)(a)."); *Battig v. Simon,* 237 F Supp 2d 1139, 1144 (D Or 2001) (employing *Reves* test in determining whether trust certificates were "securities" under Oregon law).[18]

The *Reves* test requires a court to evaluate "(1) the motivation for entering the transaction; (2) the plan of distribution; (3) the reasonable expectations of the investing public; and (4) whether there are any risk-reducing factors

---

[18] The four-factor test in *Reves* is often referred to as the "family resemblance test." For convenience, we refer simply to the "*Reves* test."

that would make application of the securities laws unnecessary." *Battig*, 237 F Supp 2d at 1144. "[C]ourts, including the Oregon appellate courts, construe the definition of 'security' liberally, to protect the investing public." *Id.* at 1143-44; *see also Foelker v. Kwake*, 279 Or 379, 385, 568 P2d 1369 (1977) ("Oregon Securities Law is to be liberally construed so as to afford the 'greatest possible protection' to the public and our previous decisions have expressly avoided 'hard and fast' rules in determining what financial transactions constitute a 'security' * * *.").

"Under *Reves*, the analysis begins with a rebuttable presumption that a note is a security * * * unless it falls into certain judicially created categories of financial instruments that obviously are not securities or if the note in question bears a 'family resemblance' to notes in those categories." *McNabb v. SEC*, 298 F3d 1126, 1131 (9th Cir 2002). "Failure to satisfy one of the factors is not dispositive; they are considered as a whole." *SEC v. J.T. Wallenbrock & Assoc.*, 313 F3d 532, 537 (9th Cir 2002).

*McNabb*, a case decided by the Ninth Circuit, guides the application of the *Reves* test here. 298 F3d 1126. In that case, the court recounted that McNabb, an employee of a broker-dealer firm, American Investors Company (AIC), held a real estate license and provided tax and accounting services.

"Between February 1994 and May 1995, McNabb borrowed approximately $690,000 from six customers in exchange for ten promissory notes. The notes had fixed rates of interest ranging from eleven to seventeen percent, interest was to be paid monthly, and payment of the principal was due on or before specific dates, which ranged from seventeen months to approximately six years."

*Id.* at 1129. McNabb used the customers' loans "to reorganize his business operations, primarily due to his own personal financial problems." *Id.* The transactions were in violation of AIC's rules against accepting loans from customers. AIC conducted an investigation of McNabb, fired him and ultimately reported him to the National Association of Securities Dealers (NASD). The NASD censured McNabb

for violations of its conduct rules, fined him, and barred him from future association with NASD members. *Id.* at 1130.

McNabb sought review before the Securities and Exchange Commission (SEC), arguing, among other things, that the promissory notes were not securities. He contended that the promissory notes were not "notes" in the sense of securities because they resembled a "bank 'character' loan" or a "commercial loan," both of which fall outside the scope of a "security." *Id.* at 1131. The SEC concluded that the promissory notes were securities and sustained the sanctions imposed against McNabb. McNabb sought judicial review of the SEC's adverse order. *Id.* at 1130.

On review, the court recognized that the promissory notes resembled neither a bank-character loan nor a commercial loan to maintain business operations. The court observed that it would not "add an additional category of financial instruments to the list of non-securities." *Id.* at 1131. To reach its decision, the court applied the *Reves* four-factor test.

First, as to the motivation for entering the transaction, the court explained that "a note is likely to be a security 'if the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate.'" *Id.* at 1131 (quoting *Reves*, 494 US at 66). The court "must look to 'the motivations that would prompt a reasonable seller and buyer to enter into [the transaction.]'" *McNabb*, 298 F3d at 1132 (quoting *Reves*, 494 US at 66). Because McNabb used the money for his business operations, the first factor favored characterization of the transaction as a security.

The second factor required the court "to examine the plan of distribution of the note to determine whether the note 'is an instrument in which there is common trading for speculation or investment.'" *McNabb*, 298 F3d at 1132 (quoting *Reves*, 494 US at 66). The court explained that broad public offerings are likely to be securities, but in McNabb's case, there were only six lenders. The court concluded that the factor did not favor finding the note to be a security.

Third, as to whether the promissory notes were reasonably perceived by the investing public as securities, the court explained that a court "must consider whether a reasonable member of the investing public would consider these notes as investments, 'even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not "securities" as used in that transaction.'"[19] *McNabb*, 298 F3d at 1132 (quoting *Reves*, 494 US at 66). The court determined that a reasonable investor could view the promissory notes as an investment.

Fourth, as to whether there were adequate risk-reducing factors, the court considered whether there was "an alternate regulatory scheme that would 'significantly reduce[] the risk of the instrument' to the lender, 'thereby rendering application of the Securities Acts unnecessary.'" *McNabb*, 298 F3d at 1132 (quoting *Reves*, 494 US at 67). McNabb had conceded that there were no risk-reducing factors in his case, and the court acknowledged that "there is the potential that the lender may be left open to significant risk." *McNabb*, 298 F3d at 1133. The court concluded that the final factor favored determining that the note was a security. The court affirmed the SEC's decision. *Id.*

We apply the *Reves* test in this case, keeping in mind that generally only notes issued in an investment context are securities governed by securities law whereas notes issued in a consumer or commercial-loan context are not. *See Reves*, 494 US at 63. Defendant concedes that there was a note employed in the 2005 rollover/recast loan transaction and acknowledges that this court must start with the presumption that a note is a security. He argues, however, that none of the four *Reves* factors weighs in favor of characterizing the note as a security and, therefore, the transaction in this case should be seen as a commercial loan rather than an investment.

We consider each of the factors in turn. As to the motivations for a buyer and seller to enter the transaction,

---

[19] A party's subjective belief (*i.e.*, a party's individually held belief that a transaction is a security) is not considered relevant to this factor. *See McNabb*, 298 F3d at 1132.

the first factor favors a determination that the note is a security. As noted in *McNabb*, "a note is likely to be a security 'if the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate.'" *Id.* at 1131 (quoting *Reves*, 494 US at 66). Here, Dorn-Platz's use of the 2005 rollover/recast loan was to bolster its substantial investment in The Round and to finance its development business. The funds generated by the loans were not being used for clear consumer or commercial purposes. Rather, the loan summary recited that, in recasting its ownership interest in The Round, Dorn-Platz would take 43 unsold, existing condominiums and 25,000 square feet of retail space, approximately half of which was already constructed, leased, and occupied by retailers. There were three additional lots on the site approved for commercial development; however, Dorn-Platz had no apparent plans for construction or development of those lots. *See McNabb*, 298 F3d at 1132 (observing that the money received from the sale of the notes was to raise general business funds).

Similar to *McNabb*, the note had a relatively high fixed rate of interest—12 percent—and the interest was to be paid monthly to the lenders with payment of the principal due on or before a specified date. *See* 298 F3d at 1129. The lenders routinely rolled their loans over into new loans, encouraging them to view their financial commitments as long-term investments. *See Wallenbrock*, 313 F3d 532, 538 (concluding that promissory notes were securities and observing that automatic rollovers of investors' notes encouraged them to view their commitment as long-term investments). The understanding of the lenders was that they would receive a high-cash return, through a 12 percent interest rate, by backing Dorn-Platz's property development-related investments. The note attracted lenders seeking significant profit by investing in Dorn-Platz's property development business. It is of no consequence that the profit took the form of interest. *Battig*, 237 F Supp 2d at 1144. Taken together, those facts support a determination that the lenders were investors interested primarily in the profit that the notes were expected to generate.

As to the plan of distribution, this second factor in itself does not indicate a security. This factor requires the court "to examine the plan of distribution of the note to determine whether the note 'is an instrument in which there is common trading for speculation or investment.'" *McNabb*, 298 F3d at 1132 (quoting *Reves*, 494 US at 66). Generally, where there is public solicitation or where notes are broadly held by the public, the factor weighs in favor of a determination that it is a security. *Compare Wallenbrock*, 313 F3d at 539 (observing that the promissory notes were broadly held, including over 1,000 investors in at least 25 states), *with Tai-Si Kim v. Kearney*, 838 F Supp 2d 1077, 1095 (D Nev 2012) (observing that the note was not offered to or broadly sold to the public). In this case, there were 13 lenders from two states, but the record does not demonstrate that the broker broadly solicited the public.

As to the reasonable expectations of the investing public, this third factor favors a determination that the note is a security. In considering this factor, we must "look to a reasonable investor, not the specific individuals in question." *McNabb*, 298 F3d at 1132. "This factor is closely related to the first factor—motivation for the transaction * * *." *Wallenbrock*, 313 F3d at 539. As we have recounted, the 2005 rollover/recast loan was part of a series of loans to Dorn-Platz, the majority of which were loan rollovers. The lenders were consistently encouraged to continue renewing their loans and, at the same time, increase the sum of their investments. The investors anticipated a high return in profit. Therefore, as in *McNabb*, the reasonable expectations of the investing public would view the transaction as an investment rather than a one-time, short-term loan.

As to whether there were any risk-reducing factors that would make application of the securities laws unnecessary, this fourth factor strongly favors a view that the note is a security. When a loan is collateralized, this factor will likely disfavor a determination that a note is a security. "[T]he absence of collateralization increases the risk of a loan because, in case of default, the lender or investor often has limited recourse to recoup the investment." *Wallenbrock*, 313 F3d at 539. Additionally, the factor is likely to favor a determination that a note is a security when "no other regulatory

scheme significantly reduced the risk of the instrument beyond resort to normal collection processes." *Tai-Si Kim,* 838 F Supp 2d at 1095.

Defendant argues that the loan in this case was collateralized, because the Inter Creditor Agreement provided for an assignment of Dorn-Platz's minority partnership interest and contribution to The Round. We disagree. The Inter Creditor Agreement expressly called for the release of the collateral in the 2004 loan—the Chuo note and Dorn-Platz's real properties. Further, the agreement allowed loans to issue without contemporaneously recorded collateral in the three commercial lots. Viewed in the light most favorable to plaintiff, Dorn-Platz's contribution to The Round and its partnership interest was, for all intents and purposes, illusory because the lenders had no way of reaching any Dorn-Platz assets. Viewed in that light, a factfinder could reasonably determine that, if all of the lenders sought to withdraw their loans rather than roll those funds over into the new 2005 rollover/recast loan, Dorn-Platz would not have had the liquidity to pay off the existing loans in full. *See Wallenbrook,* 313 F3d at 539-40 (factor favored determination of a security; noting that, "had a large number of investors wanted to cash out their notes at once, some inevitably would have been left out in the cold"). As in *McNabb,* the note posed "the potential that the lender may be left open to significant risk." 298 F3d at 1133.

In sum, the circumstances of this case differ significantly from a single, negotiated, collateralized commercial loan between private parties. *Cf. Reves,* 494 US at 66 ("If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, * * * the note is less sensibly described as a 'security.'"). Applying the *Reves* test and viewing the evidence in the light most favorable to plaintiff, we conclude that defendant was not entitled to judgment as a matter of law on the ground that the 2005 loan transaction did not involve a security.[20]

---

[20] Before the trial court, defendant contended that, even assuming that the note could be deemed a security he could not be found to have "materially aided"

## V. CONCLUSION

The trial court correctly granted defendant's motion for summary judgment as to the claim for professional liability but erred in granting the motion as to the claim for a potential violation of Oregon securities law. On the latter claim, questions of fact remain for trial.

Reversed and remanded on securities fraud claim; otherwise affirmed.

---

in fraud, deceit, or misleading. We do not understand defendant to reassert or develop that argument on appeal as a basis upon which to affirm the trial court.